UPS WORLDWIDE FORWARDING, INC., Plaintiff,

v.

UNITED STATES POSTAL SERVICE, Defendant.

Civ. A. No. 93–340–JLL.

United States District Court, D. Delaware.

May 16, 1994.

Arthur G. Connolly, Jr., Connolly, Bove, Lodge & Hutz, Wilmington, DE, and Robert L. Kendall, Jr., John E. McKeever, Maureen Murphy McBride, and Karen L. Tomlinson, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, of counsel, for plaintiff.

Richard G. Andrews, U.S. Atty., and Nina A. Pala, Asst. U.S. Atty., Wilmington, DE, Frank W. Hunger, Asst. Atty. Gen., Theodore C. Hirt and Andrea M. Sharrin, U.S. Dept. of Justice, Federal Programs Branch, and William T. Alvis, U.S. Postal Service, Washington, DC, of counsel, for defendant.

Robert K. Payson, Kathleen Furey McDonough, and Joanne Ceballos, Potter, Anderson & Corroon, Wilmington, DE, and L. Peter Farkas, Graham & James, Washington, DC, of counsel, for proposed-intervenor Air Courier Conference of America.

## OPINION

LATCHUM, Senior District Judge.

## I. BACKGROUND

On July 22, 1993, plaintiff, UPS Worldwide Forwarding, Inc. (hereinafter "UPS"), filed its complaint against defendant, United States Postal Service (hereinafter "POSTAL SERVICE"), alleging that the Postal Service's new international mail agreement, International Customized Mail (hereinafter "ICM") Service, violates various provisions of the Postal Reorganization Act (hereinafter "PRA"), specifically 39 U.S.C. §§ 101(d), 403(b)–(c), and 407(a).[1] (Docket Item ["D.I."] 1.) In response to the Postal Service's motion to dismiss for lack of standing, or alternatively, pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, (D.I. 5), UPS filed its amended complaint on November 2, 1993, alleging more specifically that it was threatened with a substantial loss of business due to the Postal Service's ICM Service. (D.I. 14, ¶¶ 19, 21.) Meanwhile, on October 19, 1993, Air Courier Conference of America/International Committee (hereinafter "ACCA"), an unincorporated membership association consisting of firms engaged in providing letter and parcel delivery services in the United States and between the United States and foreign countries, moved for leave to intervene pursuant to Rule 24(b) of the Federal Rules of Civil Procedure. (D.I. 10.) On November 16, 1993, the Postal Service filed its motion to dismiss the amended complaint. (D.I. 17.) UPS responded with its

---

1. Section 101(d) states:

   Postal rates shall be established to *apportion the costs* of all postal operations to all users of the mail *on a fair and equitable basis.* (Emphasis supplied.)
   39 U.S.C. § 101 (1980).
   Section 403(b) states:
   It shall be the responsibility of the Postal Service— ... (2) to provide types of mail service to meet the needs of different *categories* of mail and mail users. (Emphasis supplied.)
   Section 403(c) states:
   In providing services and in establishing classifications, rates, and fees under this title, the

   Postal Service *shall not,* except as specifically authorized in this title, *make any undue or unreasonable discrimination* among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user. (Emphasis supplied.)
   39 U.S.C. § 403 (1980).
   Section 407(a) in relevant part states:
   The Postal Service, with the consent of the President, may negotiate and conclude postal treaties or conventions, and may establish the rates of postage or other charges on mail matter conveyed between the United States and other countries.
   39 U.S.C. § 407 (1980).

motion for summary judgment, filed January 14, 1994. (D.I. 28.) On April 7, 1994, the Court heard oral argument on plaintiff's motion for summary judgment, defendant's motion to dismiss the amended complaint, and ACCA's motion to intervene. Before the Court now for consideration are the various motions of these parties.

## II. FACTS

On May 24, 1993, the Postal Service established its new ICM Service, which is available to customers who are capable of tendering large quantities of international mail. (D.I. 6 at 5.) Specifically, the ICM Service allows the Postal Service to negotiate individually with customers who are capable of mailing annually either one million pounds of international mail or two million dollars of international postage, and the customer must also be capable of tendering such international mail from a single location. (D.I. 6 at 6.)

In its complaint, UPS alleges that: (1) the PRA does not authorize the Postal Service to negotiate individual prices and that international service rates must be uniform for all mailers sending the same type of mail to the same destination (D.I. 14 at ¶¶ 13–18); (2) it is not possible to determine whether the Postal Service is making the same terms available to similarly-situated customers because it does not disclose certain elements of the ICM Service (D.I. 14 at ¶ 22); and (3) the ICM Service has been adopted without consent of the President of the United States as is required by the PRA (D.I. 14 at ¶¶ 26–28).

Defendant, the Postal Service, argues that: (1) UPS lacks standing to challenge the ICM Service (D.I. 18 at 10–18); (2) ICM is not in contravention to the PRA (D.I. 18 at 18–28); and (3) presidential consent is not required (D.I. 18 at 28–38).

Plaintiff seeks a permanent injunction restraining the Postal Service from entering into ICM agreements or from rendering ICM Service and from otherwise rendering international mail service to individual mailers at prices different from the rates established for the public at large. (D.I. 14 at 7–8.)

## III. APPLICABLE LAW

As stated above, defendant moved to dismiss for failure to state a claim under Fed. R.Civ.P. 12(b)(6) and for lack of standing. Fed.R.Civ.P. 12(b) provides that if a motion is made under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, and "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(b). *See also Pfizer, Inc. v. Elan Pharmaceutical Research Corp.,* 812 F.Supp. 1352, 1357 (D.Del. 1993). Additionally:

> [S]ince a motion to dismiss for lack of standing does not raise a question going to the merits of the controversy, it may be treated as a motion to dismiss for failure to state a claim for relief, and if matters outside the pleadings are admitted by the court, the motion may be treated as one for summary judgment.

5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1360, at 436 (1990). *See also Pfizer,* 812 F.Supp. at 1357–58. Therefore, the motions to dismiss, along with the motion for summary judgment, will all be treated as motions for summary judgment. However, since all parties concede that there are no genuine issues of material fact, this case essentially becomes a question of statutory interpretation. The Court will now address the legal issues which are in dispute.

## IV. DISCUSSION

### A. STANDING

The question of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). In order to meet the standing requirement, the plaintiff must satisfy the requirements of Article III as well as prudential considerations that have evolved from judicial precedent. *Valley Forge Christian College v. Americans United For Separation of Church and State,* 454 U.S. 464, 471, 102 S.Ct. 752, 757–758, 70 L.Ed.2d 700 (1982).

The constitutional standing requirement has three elements. The plaintiff must show: (1) that it "suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant"; (2) that the injury is fairly traceable to the challenged action; and (3) that it "is likely to be redressed by a favorable decision." *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758 (citations omitted). First, it is undisputed that UPS is a competitor of the Postal Service and that UPS has authority to compete in the international parcel delivery market. 39 CFR § 320.6 (1993). Second, the Postal Service by its own admission has enacted the ICM agreements with the intent to pull business away from UPS and other international delivery services.[2] As a result of the Postal Service's actions, UPS could lose substantial business in the international postal market. Plaintiff has established that the new ICM service will cause a direct, imminent injury by eroding UPS' client base. Plaintiff has met the causation test, because it is clear that any harm would be attributable to the fact that former UPS customers are now engaging in the ICM service agreements with the Postal Service. Finally, if the Court were to enjoin the ICM agreements, the harm suffered by UPS would be extinguished. Thus, plaintiff has met the constitutional standing requirement.

In order to satisfy the prudential standing requirement: (1) "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"; and (2) "the plaintiff's complaint [must] fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge,* 454 U.S. at 474–75, 102 S.Ct. at 760. First, UPS has a legally protected right to compete in the international parcel delivery market pursuant to 39 C.F.R. § 320.6. The plaintiff is asserting that its legal right to compete is being harmed by the ICM agreements which the Postal Service admits are intended to attract customers from its competitors such as UPS. Second, as the Supreme Court has explained, the "zone of interests" test is not meant to be especially demanding and there does not have to be an indication that Congress, in enacting the PRA, intended to benefit the would-be plaintiff. *Clarke v. Securities Industry Assn.,* 479 U.S. 388, 399–400, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). It is unclear who would have standing to challenge the ICM agreements, if not a competitor. Certainly, a mailer who is able to get a better deal from the Postal Service than from UPS would not challenge the ICM agreements. Additionally, the Postal Service concedes that, "[a]s a competitor of the Postal Service in international mail, UPS has standing to complain of allegedly unlawful rates only to the extent that it is harmed as a competitor." (D.I. 18 at 14.) Therefore, the Court concludes that UPS possesses the requisite standing to bring and maintain this lawsuit.

## B. LACK OF AUTHORITY UNDER THE PRA TO ENTER INTO ICM

UPS argues that the ICM agreements violate: (1) sections 403(b)(2) and 407 of the PRA because the Postal Service is required to establish international rates for types of service and for categories of mail and mail users; (2) section 403(c) of the PRA which prohibits the Postal Service from unreasonably discriminating among mailers; and (3) section 101(d) of the PRA because the Postal Service is required to establish rates which apportion the cost of postal operations to all users of mail on a fair and equitable basis.

First, § 403(b)(2) refers to the establishing of *categories* of mail and mail users. Plaintiff argues that since each of the ICM agreements is individually negotiated, the Postal Service has thus failed to set up ascertainable categories which apply to all similarly-situated mailers. Defendant contends that, in fact, each of the individually negotiated agreements is a separate category in and of itself. However, defendant's interpretation of the statute makes the term "category"

---

**2.** ICM is designed "to attract customers that currently use competitors and would not otherwise use the Postal Service for their international mailings. If the Postal Service is successful, the additional volume will come from competitors, not from the Postal Service's other international services." 58 Fed.Reg. 29778, 29780 (1993).

meaningless. If the Postal Service can establish a new category of mail with each and every one of its customers via a separate ICM agreement, then it is effectively creating individually negotiated rates. It is by no means clear that Congress intended to give the Postal Service the broad-ranging authority that it claims to have in the international rate-making area. The Court finds that the individually negotiated rates thus violate the requirement that mail service meet the needs of different categories of mail and mail users. For this reason, the ICM agreements must be enjoined.

■ Second, § 403(c) on its face prohibits undue or unreasonable discrimination among users of mail. The Postal Service concedes that the nondiscrimination policies in § 403(c) are applicable to international mail service under § 407. (D.I. 39 at 12.) In order to qualify for an ICM agreement, a customer must be *capable* of tendering either one million pounds of international mail or two million dollars' worth of international postage. Since the mailer who enters into an ICM agreement does not actually have to tender the requested amount, but only be capable of doing so, then a large-volume company will be allowed to engage in ICM agreements, and a small-volume company will not, even if they both wind up tendering the same amount of mail or postage at the end of the year. Unreasonable discrimination occurs when a large-volume company gets a cheaper rate via an ICM agreement, even though it tenders the same amount or even less mail than a small-volume company. The smaller company cannot gain the benefits of ICM service because it fails to meet the threshold capability requirements of ICM service. Seemingly, there is no reasonable explanation as to why the Postal Service uses capability as a criteria rather than actual performance. The Court finds that the ICM agreements are in violation of § 403(c) and thus must be enjoined.

■ Third, § 101(d) requires the Postal Service to apportion the costs of its services on a fair and equitable basis. Under the ICM system, small-volume mailers who are not able to meet the threshold capacity requirements of the ICM agreements are not able to gain the benefit of an individually-negotiated, lower rate. The costs are not apportioned fairly, because under the ICM, there is no requirement that the large-volume mailer actually deliver more mail than the small-volume mailer. Thus, the usual justification offered for charging less for a greater volume would not apply in this situation. The Court recognizes that there are some cost-savings on the part of the Postal Service when it deals with large-volume mailers. Therefore, it would not be contrary to the PRA for the Postal Service to offer a cheaper rate to a customer who delivers large quantities of mail. However, in a situation where the customer gets a cheaper rate, but does not have to guarantee a certain volume, it will be the small-volume companies who are left to subsidize the large-volume companies. Since ICM has the potential to apportion the costs of postal operations in an unfair manner, it violates § 101(d) of the PRA.

## C. PRESIDENTIAL AUTHORITY IS NEEDED FOR ICM

■ Finally, UPS argues that the ICM agreements are contrary to the PRA because the Postal Service has not gained presidential approval as is required by § 407(a): "The Postal Service, *with the consent of the President, may negotiate and conclude postal treaties or conventions, and may establish the rates of postage or other charges on mail matter* conveyed between the United States and other countries." 39 U.S.C. § 407 (1980) (emphasis supplied). The Postal Service concedes that the President has not consented, but argues that the placement of the comma after the word "conventions" indicates that Congress did not intend for the presidential consent requirement to apply to the second clause of that sentence pertaining to the setting of rates of postage. The Postal Service insists that if presidential consent were required, then the comma would not be present in the statute.

A look at the origin and history of this act is instructive. The precursor to § 407 originated in 1851. The 1851 statute reads as follows:

> And the Postmaster–General, *by and with the advice and consent of the President*

*of the United States, shall be, and he hereby is, authorized to reduce or enlarge, from time to time, the rates of postage* upon all letters and other mailable matter conveyed between the United States and any foreign country.

Act of March 3, 1851, ch. 20, § 2, 9 Stat. 587, 589 (1851) (emphasis supplied).

Thus, it is clear that the Post Office had authority to change the rates of postage only with the consent of the President. In 1872, a new provision was added to the statute which then read: "[T]he Postmaster–General, *by and with the advice and consent of the President, may negotiate and conclude postal treaties or conventions, and may reduce or increase the rates of postage* on mail-matter conveyed between the United States and foreign countries." Act of June 8, 1872, ch. 335, § 167, 17 Stat. 283, 304 (1872) (emphasis supplied). The only change which occurred in the 1872 statute was that the Postmaster General could then also negotiate and conclude postal treaties and conventions as well as reduce or increase the rates of postage. However, in both situations, the advice and consent of the President was required. The mere creation of additional authority to negotiate postal conventions with the consent of the President cannot be read to eliminate the preexisting requirement of presidential consent for changes in international postal rates. Rather, in the 1872 statute, Congress continued the requirement that the Postmaster General obtain presidential consent in order to change international postal rates while in that same section granted the Postmaster General the additional authority to conclude postal conventions with the consent of the President.

Finally, in 1970, the statute was changed to its present form—§ 407(a). The statute remained virtually unchanged, but now provided that the Postmaster General could establish rates as opposed to simply increasing or decreasing them. Presidential consent was still required and there is no indication in either the 1872 Act or the 1970 statute that Congress intended to give the Postmaster General the authority to change or set rates without presidential approval.

After tracing the history of the Act, it becomes clear that presidential consent was always required. The only change in the statute was an additional provision which allowed the Postmaster General the authority to negotiate and conclude postal treaties and conventions, also subject to presidential consent.

The Postal Service also contends that it would be redundant for the President to approve a rate after it has already been adopted in a postal convention. This much is true. While the Postmaster General may have implemented the rates set in the conventions without further presidential approval, the Postmaster General did so only once the convention was ratified by the President. Obviously, when the President approves a convention which contains international postal rates, he, of necessity, consents to those rates. For the reasons stated above, the Court finds that presidential consent is required under § 407 when the Postal Service makes new, international postal rates.[3]

### D. MOTION TO INTERVENE

■ A party may permissively intervene pursuant to Fed.R.Civ.P. 24(b)(2)[4] if: (1) the application is timely; (2) the applicant's claim and the main action have a question of law or fact in common; and (3) the intervention will not unduly delay or prejudice the adjudication of the rights of the original parties. *Brody By and Through Sugzdinis v. Spang*, 957 F.2d 1108, 1115–16 (3d Cir.1992).

---

**3.** An additional reason for requiring presidential consent is the fact that the setting of international rates involves issues of foreign policy. Since the setting of international rates could potentially affect the relations of the United States with other countries, it is inconceivable that Congress would allow the Postal Service to have such free reign to set international postal rates.

**4.** Fed.R.Civ.P. 24(b) states in relevant part:

(b) **Permissive Intervention.** Upon timely application anyone may be permitted to intervene in an action: ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common. * * * In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Fed.R.Civ.P. 24.

When determining whether the motion was timely, the Court should consider three factors: (1) how far the proceedings have progressed when the applicant seeks to intervene; (2) the prejudice to the other parties which results from the delay; and (3) the reason for the delay. *Karr v. Castle,* 768 F.Supp. 1087, 1091 (D.Del.1991). In the case at bar, the motion to intervene was filed less than three months after the suit was initiated by UPS, less than one month after the Postal Service filed its motion to dismiss, and before any discovery had commenced. In *Chiles v. Thornburgh,* the Court held that a motion to intervene was timely where the motion was filed seven months after the complaint and three months after the defendant filed its motion to dismiss. *Chiles v. Thornburgh,* 865 F.2d 1197, 1213 (11th Cir.1989). *See also Deutschman v. Beneficial Corp.,* 132 F.R.D. 359, 380 (D.Del.1990) (motion to intervene held to be timely where it was filed well before the close of discovery); *Jet Traders Inv. Corp. v. Tekair, Ltd.,* 89 F.R.D. 560, 568 (D.Del.1981) (although there was no good reason for an eight-month delay between the completion of pleadings and the filing of the motion to intervene, "where discovery has not been completed, [where] there have been no significant decisions on the merits considered or decided, and the parties could not be prejudiced by that delay, the motion must be considered timely"). The Court further considers the fact that the Postal Service has not challenged the timeliness of the motion to intervene. The Court finds that the three-month delay will not prejudice any of the parties in the suit and thus holds that the motion to intervene is timely.

Next, the Court must consider whether there is a question of law or fact in common. In May, 1993, the Postal Service adopted the International Customized Mail Rule, which is being challenged as a violation of the PRA. Air Courier is the trade association of the expedited delivery industry and alleges that it has been and continues to be harmed by this Postal Rule. (D.I. 19 at 3, 12.) Thus, ACCA has asserted a legal interest which is clearly related, if not identical, to the main action.

Finally, as to prejudice or delay, the Court notes that allowing ACCA to intervene will not expand the issues currently being litigated. The Court is unaware of any circumstances, nor has the Postal Service in its opposition to intervention raised any argument, which would suggest that prejudice or delay would result from allowing ACCA to permissively intervene. For these reasons, the Court will grant ACCA's motion for permissive intervention.[5]

## V. CONCLUSION

This Court holds that UPS has the requisite standing necessary to challenge the Postal Service's new ICM agreements. Further, the Court finds that the ICM Service violates various sections of the PRA because: (1) it fails to establish categories of mail and mail users; (2) it unreasonably discriminates among users of the mail; and/or (3) it fails to apportion the costs of postal operations on a fair and equitable basis. Alternatively, the Court holds that the ICM agreements violate the PRA because they fail to have presidential approval as is required by § 407 of the PRA. As such, an injunction will be issued forthwith prohibiting the Postal Service from further engaging in any ICM arrangements. Finally, the Court grants ACCA's motion to intervene as a permissive intervenor.

---

5. As the proposed intervenors have noted in their briefs, the Postal Service has not challenged ACCA's motion to intervene on the grounds that ACCA has failed to satisfy the required elements of Rule 24, but rather on the theory that ACCA lacks standing to intervene. The Court has not addressed whether ACCA possesses the requisite standing necessary to have initiated the lawsuit originally. This discussion is not necessary in light of the Court's determination that UPS has standing to challenge the postal regulations and that ACCA satisfies the requirements of permissive intervention. *See Indian Recovery Co. v. The China,* 108 F.R.D. 383, 386 (D.Del.1985) (noting that "[a]n intervenor need not have standing necessary to have initiated the lawsuit").