**SCHERING CORPORATION, Appellant,**

v.

**FOOD AND DRUG ADMINISTRATION.**

No. 94–5366.

United States Court of Appeals,
Third Circuit.

Argued Jan. 24, 1995.

Decided April 3, 1995.

Robert P. Reznick (argued), Hughes, Hubbard & Reed, Washington, DC (Joseph C. Connors, Maureen O. Chelius, Schering Corp., Kenilworth, NJ, of counsel), for appellant.

Michael A. Chagares, Office of U.S. Atty., Newark, NJ, Frank W. Hunter, Asst. Atty. Gen., Gerald C. Kell, Susan Strawn (argued), Office of Consumer Litigation, Civ. Div., U.S. Dept. of Justice, Washington, DC (Margaret Jane Porter, Chief Counsel, Eric M. Blumberg, Deputy Chief Counsel, Areta L. Kupchyk, Food and Drug Admin., Rockville, MD, of counsel), for appellee.

Before: MANSMANN, HUTCHINSON and McKEE, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

The issue before us, brought in the context of a pioneer drug [1] manufacturer's challenge to the propriety of FDA approval of non-systemically effective generic drugs pursuant

---

1. A pioneer drug is the first drug product containing a particular active ingredient to obtain FDA approval for a specified use. *See* 21 U.S.C.A. § 355(b) (West Supp.1994).

to an abbreviated approval process, is one of first impression in the courts of appeals. We must determine whether the bioequivalence requirements, set forth in section 355(j)(7)(B) of Title I of the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Act"), Pub.L. No. 98–417, 98 Stat. 1585 (1984), otherwise known as the "Hatch–Waxman Amendments" to the Food, Drug and Cosmetic Act (the "FDCA"), are the exclusive means for determining the bioequivalence of generic drugs approved pursuant to the abbreviated new drug application procedure ("abbreviated application" or "ANDA") embodied in that Act. 21 U.S.C.A. § 355(j) (West Supp.1994). A bioequivalent generic drug is one that the FDA has determined to be as safe and effective as the pioneer drug it copies.

We decide this issue in the context of a challenge by Schering Corporation, a research-based manufacturer and distributor of pharmaceutical products, to the Food and Drug Administration's final regulation implementing the ANDA provisions of the Act. The FDA regulation at issue, codified at 21 C.F.R. § 320.1(e) (1994), was promulgated in 1992 to implement the bioequivalence requirements for generic drugs approved under the abbreviated application procedure. Schering charges that the FDA impermissibly broadened the exclusive statutory definition of bioequivalent by substituting the statutorily prescribed measurement of drug "absorption" with a measurement which calculates when the drug becomes "available at the site of drug action." *See* 21 U.S.C.A. § 355(j)(7)(B) (West Supp.1994); 21 C.F.R. § 320.1(e) (1994).

The district court entered summary judgment in favor of the FDA, holding that section 355(j)(7)(B) is not the exclusive means for determining the bioequivalence of a generic drug to its pioneer drug counterpart. On Schering's appeal, we find the language of 21 U.S.C.A. § 355(j)(7)(B) (West Supp. 1994) ambiguous and consistent with *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81

L.Ed.2d 694 (1984), we hold that the FDA regulation at 21 C.F.R. § 320.1(e) (1994) is a permissible construction of that statute. Accordingly, we will affirm the judgment of the district court.

## I.

To receive approval under an abbreviated new drug application, a generic drug manufacturer must establish that its drug is the bioequivalent of a pioneer drug. 21 U.S.C.A. § 355(j)(2)(A)(iv) (West Supp.1994). The Act provides:

A drug shall be considered to be bioequivalent to a listed drug [2] if—

(i) the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same ... dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses; or

(ii) the extent of absorption of the drug does not show a significant difference from the extent of absorption of the listed drug when administered at the same ... dose of the therapeutic ingredient under similar experimental conditions ... and the difference from the listed drug in the rate of absorption of the drug is intentional, is reflected in its proposed labeling, is not essential to the attainment of effective body drug concentrations on chronic use and is considered medically insignificant for the drug.

21 U.S.C.A. § 355(j)(7)(B) (West Supp.1994). The FDA regulation at issue implementing subpart (i) of this statutory provision defines bioequivalence in relevant part as "the absence of a significant difference in the rate and extent to which the active ingredient ... becomes available at the site of drug action when administered at the same ... dose under similar conditions in an appropriately designed study." 21 C.F.R. § 320.1(e) (1994). Schering does not challenge the regulation implementing subpart (ii) of the

---

**2.** A listed drug is a drug that has been approved for safety and effectiveness under 21 U.S.C. § 355(c) prior to September 24, 1984, which was

included on a published list of drugs approved by the FDA. See 21 U.S.C.A. §§ 355(j)(2)(A)(i) and (j)(6)(A)(i)(I) (West Supp.1994).

above-quoted provision regarding intended differences in the rate of availability from a listed drug.

Schering manufactures and distributes the pioneer drugs Proventil[RM], an aerosol metered-dose asthma inhaler, and Lotrimin[RM], an antifungal cream, both of which are non-systemically effective drugs ("NSEDs"). NSEDs are products that derive their effectiveness from application directly at the site of drug action, such as by application of an ointment to the skin or inhalation of a drug-containing mist into the lungs, rather than through systemic absorption into the bloodstream. Schering challenges the regulatory definition of bioequivalence as impermissibly substituting the statutory reference to the rate and extent of drug absorption with a reference to the rate and extent to which a drug becomes available at the site of drug action. Schering argues that section 355(j)(7)(B) unambiguously sets forth the exclusive definition of bioequivalence; therefore, all generic drugs seeking approval pursuant to the ANDA process must meet one of the two criteria set forth in section 355(j)(7)(B) to establish bioequivalence, both of which require absorption[3] data.

The FDA disputes that absorption data is required to establish the bioequivalence of generic NSEDs. Bioequivalence occurs when two drugs possess the same efficacy. The FDA argues that bioequivalence can be measured by using one of several methodologies, including absorption; however, the appropriate method used depends on the type of drug under consideration for approval. The FDA, therefore, views section 355(j)(7)(B) as delineating a "safe harbor" or circumstances when the FDA *must* recognize a generic drug as the bioequivalent of a pioneer drug, but not as a limitation on the criteria the FDA may use to ascertain bioequivalence.

In 1989, Copley Pharmaceutical, Inc., filed an abbreviated application pursuant to section 355(j) to manufacture and market a generic copy of Proventil[RM]. On December 4, 1989, Schering filed a Citizen Petition with the FDA, pursuant to 21 C.F.R. § 10.25 (1990), seeking *inter alia* a declaration that section 355(j)(7)(B) set forth the exclusive means for determining bioequivalence in terms of the rate and extent of drug absorption and that absorption data could not as a practical matter be provided for NSEDs such as Proventil[RM] or its generic counterpart because they do not depend on absorption to achieve their desired effect. The FDA responded to Schering's Citizen Petition on June 29, 1990, denying the requested relief. The FDA stated its position that a generic drug may satisfy the statutory bioequivalence requirement even if it does not meet the absorption criteria set forth in section 355(j)(7)(B). This constituted final agency action from which relief could be sought in a United States District Court. *See* 21 C.F.R. § 10.45(d) (1990).

Schering thus sought review of the FDA's response to its Citizen Petition in the United States District Court for the District of Columbia. While cross-motions for summary judgment were pending, the FDA approved Copley's ANDA to manufacture and market a generic version of Proventil[RM]. Schering immediately filed a motion for preliminary injunction to enjoin the FDA's approval of the generic version of Proventil[RM], which the district court denied. The district court granted the FDA's motion for summary judgment, concluding that section 355(j)(7)(B) did not set forth the exclusive means for determining bioequivalence and that the FDA's interpretation of the statute as permitting alternative methodologies to establish bioequivalence was reasonable. *Schering Corp. v. Sullivan,* 782 F.Supp. 645, 650 (D.D.C.1992), *vacated as moot sub nom,*

---

**3.** At oral argument, Schering clarified that it defines "absorption", relying in part on comments of the FDA accompanying the Final Abbreviated New Drug Application Regulations, to mean that "[a]ll drugs must be absorbed through some physical barrier to reach the site of drug action, even if that absorption involves only dispersion into a body fluid pool or entry into surface cells." Abbreviated New Drug Application

Regulations, 57 Fed.Reg. 17,950, 17,972 (1992) (codified at 21 C.F.R. §§ 2, 5, 10, 310, 314, 320 and 433). Schering argues that the FDA interprets too narrowly section 355(j)(7)(B) "absorption" as systemic absorption, resulting in the FDA's unwarranted conclusion that Schering seeks to prevent an entire class of drugs, NSEDs, from being approved through the ANDA process.

*Schering Corp. v. Shalala,* 995 F.2d 1103 (D.C.Cir.1993).

Schering appealed the district court's judgment to the United States Court of Appeals for the District of Columbia Circuit, challenging the legal conclusion that the FDA is not limited to the absorption criteria set forth in section 355(j)(7)(B) to determine the bioequivalence of a generic drug to its pioneer drug counterpart. During the pendency of the appeal, the FDA issued final regulations regarding the ANDA process, including its definition of the term bioequivalence. 57 Fed. Reg. 17,949–18,001 (1992). The court of appeals determined that the newly promulgated 1992 regulations rendered moot Schering's appeal based on the FDA's Citizen Petition Response and, therefore, vacated the district court opinion. *Schering Corp. v. Shalala,* 995 F.2d 1103 (D.C.Cir.1993). The court recognized that Schering's challenge to the FDA's construction of section 355(j)(7)(B) should be brought in the context of the new regulations.

**4.** Schering also requested injunctive relief precluding the FDA from releasing Schering's safety and efficacy data pursuant to section 355(*l*)(5). Section 355(*l*)(5) provides:

> Safety and effectiveness data and information which has been submitted in an application under subsection (b) of this section for a drug and which has not previously been disclosed to the public shall be made available to the public, upon request, unless extraordinary circumstances are shown—
>
> . . . .
>
> (5) upon the effective date of the approval of the first application under subsection (j) of this section which refers to such drug or upon the date upon which the approval of an application under subsection (j) of this section which refers to such drug could be made effective if such an application had been submitted.

21 U.S.C.A. § 355(*l*)(5) (West Supp.1994). Schering's argument in this regard is dependent upon a finding in favor of Schering on the merits of its challenge. Schering argued that since NSEDs cannot be approved pursuant to the ANDA process, trade secret data for pioneer NSEDs cannot be released pursuant to section 355(*l*)(5) because there is no known testing method that would permit the statutory bioequivalence requirement to be met. In light of its ruling in favor of the FDA on the merits, the district court denied Schering's request for injunctive relief precluding the FDA from releasing Schering's safety and efficacy data.

On August 10, 1993, Schering filed this present action in the United States District Court for the District of New Jersey, challenging the FDA's regulation at 21 C.F.R. § 320.1(e) (1994) as impermissibly broadening the statutory definition of bioequivalent.[4] Converting the FDA's motion to dismiss to a motion for summary judgment in light of the parties' submissions outside the briefs,[5] the court granted the FDA's motion regarding the merits of Schering's claims and denied Schering's motion for summary judgment. *Schering Corp. v. Food and Drug Admin.,* 866 F.Supp. 821 (D.N.J.1994).

The district court found that Schering had standing to maintain this action. The district court determined and the FDA did not contest that Schering's loss of monopoly profits sustained the injury-in-fact requirement for Article III standing. As to prudential standing, the district court found that Schering's interests in protecting profits was congruent with one of the two congressional concerns prompting the passage of the Act—ensuring the safety of generic drugs.[6] The district

**5.** The FDA filed a motion for judgment on the pleadings on grounds that Schering lacked standing to challenge the regulation or, alternatively, that Schering failed to state a claim upon which relief could be granted. Schering filed a motion for summary judgment based on its view that the Act unambiguously defines bioequivalent. Schering submitted the FDA's Citizen Petition Response and comments to the FDA final ANDA regulations with its brief in support of its motion for summary judgment. The FDA submitted the relevant provisions of the FDA regulations with its memorandum in support of its motion for judgment on the pleadings and in opposition to Schering's motion for summary judgment. The FDA also submitted the Declaration of Donald B. Hare, the Special Assistant for the Director, Office of Generic Drugs, Center for Drug Evaluation and Research, Food and Drug Administration, in support of its reply to Schering's opposition to the FDA's motion for judgment on the pleadings.

**6.** Schering also asserted it had standing pursuant to FDA regulations that provide an "interested person" the right to seek judicial review of final agency action. *See* 21 C.F.R. § 10.45(d). The district court found that an administrative agency by regulation could not circumvent the requirements for Article III or prudential standing for an action brought pursuant to the Federal Administrative Procedure Act, 5 U.S.C. § 702.

court then adopted the reasoning of Judge Boudin in *Schering Corp. v. Sullivan*, 782 F.Supp. 645 (D.D.C.1992), *vacated as moot sub nom, Schering Corp. v. Shalala*, 995 F.2d 1103 (D.C.Cir.1993), concluding that section 355(j)(7)(B) did not set forth the exclusive definition of bioequivalent.[7]

Schering appeals the district court's finding that section 355(j)(7)(B) is a non-exclusive provision for determining whether a generic drug is the bioequivalent of the pioneer drug it copies and the denial of its request to enjoin the FDA from disclosing confidential safety and effectiveness data for Schering's pioneer NSEDs. Schering also raises the issue of the propriety of the district court's conversion of the FDA's motion for judgment on the pleadings into a motion for summary judgment without providing Schering a "reasonable opportunity" to respond to the Declaration of Donald Hare filed concurrently with the FDA's final brief in support of its motion.

We turn first to the threshold issue of Schering's standing to challenge the FDA regulation given the FDA's contention that Schering lacks prudential standing.

## II.

 Article III standing is satisfied when a plaintiff demonstrates that it has suffered an actual or threatened injury as a result of the defendant's conduct which is capable of redress. *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 537–38 (3d Cir.1994). Prudential standing requires that Schering assert legal interests of its own within the "zone of interests" the Act protects, thereby ensuring that the federal courts will not be adjudicating abstract questions of wide public significance that are nothing more than generalized grievances. *Id.* The "zone of interest" test is a guide to determine whether a

particular plaintiff may bring an action pursuant to the Administrative Procedure Act, 5 U.S.C.A. § 702,[8] to complain of a particular agency action. *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). When, as here, the plaintiff is not itself subject to the challenged agency action, the zone of interests test denies a right of review if the plaintiff's interests are only marginally related to the purpose of the statute. *Id.* The test, however, is not so stringent that it requires the would-be plaintiff to be specifically targeted by Congress as a beneficiary of the statute. *Id.* at 399–400, 107 S.Ct. at 757–58. Our review of the district court's judgment is plenary. *Polychrome International Corp. v. Krigger*, 5 F.3d 1522 (3d Cir.1993).

The FDA did not contest before the district court and does not contest here that Schering's potential loss of monopoly profits upon FDA approval of a competitive generic substitute is sufficient to meet the Article III injury-in-fact standing requirement. Instead, the FDA challenges the district court's finding that Schering met prudential standing requirements to assert a claim to protect its loss of monopoly profits.

 Plaintiffs who suffer economic injury from unlawful competition may fall within the "zone of interests" protected by "entry-restricting" statutes to establish prudential standing. *See, e.g., First Nat'l Bank and Trust Co. v. Nat'l Credit Union Adm.*, 988 F.2d 1272, *cert. denied sub nom, AT & T Family Fed'l Credit Union v. First Nat'l Bank & Trust Co.*, —— U.S. ——, 114 S.Ct. 288, 126 L.Ed.2d 238 (1993) (investment bankers had standing to challenge a ruling by the Comptroller of Currency that permitted banks to overcome a statutorily imposed limitation on their securities underwriting and investment activities, which was de-

---

**7.** Judge Boudin had determined that the intent underlying section 355(j)(7)(B) was clear from the language, structure and legislative history of the Hatch–Waxman Amendments to the FDCA; that Congress intended that the FDA retain its historically wide discretion in determining bioequivalence. Even if the statute were ambiguous, Judge Boudin nevertheless would uphold the FDA's interpretation as reasonable in light of the FDA's practice of accepting alternative showings

of bioequivalence and the absence of evidence that Congress intended to override that practice.

**8.** Section 702 provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. . . .

signed to protect bank depositors from risky bank activities and not to protect investment bankers from competition). In such cases, the plaintiff's interests in protecting its competitive position may coincide with the legislative purpose of imposing an entry restriction. When a plaintiff's protection of its competitive interests, however, fails to coincide with the legislative purpose of the statute it seeks to enforce, prudential standing will not lie. *See, e.g., Calumet Industries, Inc. v. Brock,* 807 F.2d 225 (D.C.Cir. 1986) (chemical manufacturers lacked standing to challenge Occupational Safety and Health Administration ("OSHA") Notice of Interpretation regarding labeling requirements to protect their sales and profits given that interest protected by the Occupational Health and Safety Act is worker safety, not competitive interests); *Hazardous Waste Treatment Council v. Environmental Protection Agency,* 861 F.2d 277 (D.C.Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989) (national trade organization of firms engaged in treatment of hazardous waste lacked prudential standing to challenge EPA regulations as not fully complying with requirements of the Resource Conservation and Recovery Act ("RCRA") given that RCRA evidences congressional intent to foster cleaner environment but does not evidence intent to benefit pecuniary interests of such firms).

█ The bioequivalence requirement set forth in section 355(j)(7)(B) acts as a market entry restriction imposed to ensure that generic drugs will be as safe and effective as their pioneer drug counterparts. *See* Vol. 130 Part 17 Cong.Rec. 24,425 (1984) (statement of Rep. Skelton: "The approval process . . . assures that, while generic drugs will be made more quickly available, the quality and effectiveness of those drugs will not be reduced."). *See also* H.R.Rep. No. 98–857, 98th Cong., 2nd Sess. pt. I, *reprinted in* 1984 U.S.S.C.A.N. at 2647–68 ("Generic copies of any drugs may be approved if the generic is the same as the original drug or so similar that FDA has determined the differences do not require safety and effectiveness testing."). Schering's interest, as a pioneer drug

manufacturer seeking to enforce the entry restrictions imposed upon generic drug manufacturers using the ANDA process, is aligned with one of the interests Congress intended to protect or benefit through the passage of the Act. In *Tri–Bio Laboratories, Inc. v. Food and Drug Admin.,* we recognized the balance of interests struck by Congress in enacting the Drug Price Competition and Patent Term Restoration Act as follows:

> This statute attempts to balance the interests of the generic drug manufacturers, who sought to avoid unnecessary testing, against the research investments of the pioneer manufacturers, at the same time mindful of the public need for safe commercial drugs. The 1984 Amendments, which applied only to human drugs, reflect a statutory compromise of the competing concerns.

836 F.2d 135, 139 (3d Cir.1987), *cert. denied,* 488 U.S. 818, 109 S.Ct. 57, 102 L.Ed.2d 35 (1988) (veterinary drugs were not within the purview of the 1984 Amendments to the Food, Drug and Cosmetic Act). This action to enforce the terms of the Act comports with the congressional purpose that the statutory amendments passed to aid generic drug competition not diminish the safety of commercial drugs. Pioneer drug manufacturers are well-positioned to monitor FDA regulations implementing statutorily mandated requirements for the abbreviated approval of generic competitor drugs when it is their pioneer drug the generic manufacturer seeks to copy. They possess the scientific data to recognize when the FDA may stray from the legislatively mandated testing requirements that impact the safety and effectiveness of the generic drug. The fact that actions by such parties may thwart the competing congressional purpose of easing the entry of generic drugs into the market is subsumed by the overriding necessity of ensuring public access to safe commercial drugs. As such, we find that the district court did not err in holding that Schering was a suitable challenger to the FDA regulations implementing section 355(j)(7)(B).[9]

---

**9.** We note that Schering raised alternative bases

for standing; however, we need not reach those

### III.

■ In *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court set forth standards for our review of an agency's interpretations of the statute it is entrusted to administer. We exercise plenary review of the construction of statutes administered by an agency when Congress has unambiguously addressed the question at issue. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82; *Passaic Valley Sewerage Commissioners v. United States Department of Labor,* 992 F.2d 474, 478 (3d Cir.), *cert. denied,* ── U.S. ──, 114 S.Ct. 439, 126 L.Ed.2d 373 (1993). If, however, the statute is ambiguous regarding the issue, our task is to determine whether the agency's interpretation is a permissible construction of the statute. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. Obviously, our first step here is to review the text of section 355(j)(7)(B) to determine whether the intent of the statute is unambiguous; *i.e.,* whether the text clearly reflects Congressional intent to make it the *exclusive* means by which the bioequivalence of a generic drug may be established for purposes of the ANDA procedure.

### A.

■ Section 355(j)(7)(B) provides in relevant part:

(B) A drug shall be considered to be bioequivalent to a listed drug if—

(i) the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses; or

21 U.S.C.A. § 355(j)(7)(B)(i) (West Supp. 1994). The language on its face, as Judge Boudin observed, is neutral—it neither imposes nor forecloses the interpretation that it

issues given our ruling that Schering's competitor interest provided standing to sustain its chal-

is an exclusive definition of bioequivalent. *See* 782 F.Supp. at 645.

Even when reviewed in the context of the entire Act, we find the language of the section to be ambiguous. Congress delineated two terms within section 355(j)(7), "bioavailability" and "bioequivalent." Section 355(j)(7)(A) provides in relevant part:

(7) For purposes of this subsection:

(A) The term "bioavailability" means the rate and extent to which the active ingredient or therapeutic ingredient is absorbed from a drug and becomes available at the site of drug action.

21 U.S.C.A. § 355(j)(7)(A) (West Supp.1994). Judge Boudin relied upon a comparison of the language used to introduce each of these terms to support his conclusion that section 355(j)(7)(B) did not set forth an exclusive definition of bioequivalent. He relied on the rule of statutory construction that when one of two closely related subsections possesses limiting language that the other lacks, we may presume the omission was intentional. *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300–01, 78 L.Ed.2d 17 (1983) (determining the meaning of "interest" as used in 18 U.S.C. § 1963(a)(1) was the broader ordinary meaning of the word rather than the more restrictive term "interest in enterprise" that was used in 18 U.S.C. § 1963(a)(2)). *See also Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.,* 998 F.2d 1192, 1201 (3d Cir. 1993), *cert. denied,* ── U.S. ──, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994) (court declined to read a predecessor liability provision into 29 U.S.C. § 1362 when another section of the same statute, section 1369, articulated a rule of predecessor liability).

We find that the disputed language in section 355(j)(7), which is a definitional section, is not as susceptible to clarification through application of this rule of construction as were the specific statutory terms in *Russello* and *White Consolidated Industries.* We recognize that the language of sub-section (j)(7)(A) that " 'bioavailability' *means* the rate and extent" is indicative of an exclusive definition. *See Weinberger v. Hynson, Westcott*

lenge to the FDA regulations.

*& Dunning, Inc.,* 412 U.S. 609, 630, 93 S.Ct. 2469, 2483–84, 37 L.Ed.2d 207 (1973). Nonetheless, Congress' use of the less precise phrase *"shall be considered to be"* to introduce "bioequivalent" does not compel the conclusion, as was the case in *Russello,* that Congress intended section 355(j)(7)(B) to be non-exclusive and as merely establishing a "safe harbor" mandating the approval of some generic drugs. It is not apparent to us that the use of a different introductory phrase precludes the conclusion that Congress intended section 355(j)(7)(B) to represent the exclusive standard to determine the bioequivalence of generic drugs to their pioneer drug counterparts. This conclusion is buttressed by a comparison of the impact the terms have on the operation of the Act.

"Bioavailability," though clearly a defined term, is not referenced elsewhere in the Act and has no apparent impact on the operation of the Act. "Bioequivalent," however, is essential to the operation of the Act. All ANDAs submitted to the FDA pursuant to section 355(j) must contain "information to show that the new drug is bioequivalent to the listed drug." 21 U.S.C.A. § 355(j)(2)(A)(iv) (West Supp.1994). Indeed, it is peculiar that Congress defined "bioavailability," a term that has no apparent impact on the operation of the Act; the parties' explanations have not clarified this difficult scientific issue.[10]

### B.

Section 355(j)(6)(A)(i)(III), which affirmatively suggests that means other than systemic absorption may be employed to ascer-

tain the bioequivalence of a generic drug, further confounds the issue of the exclusivity of section 355(j)(7)(B). 21 U.S.C.A. § 355(j)(6)(A)(i)(III) (West Supp.1994). That section vests the FDA with discretion to determine whether *in vitro* or *in vivo*[11] bioequivalence studies, or both, will be required for the approval of generic drugs under the abbreviated application process. *Id.* Vesting the FDA with discretion to authorize *in vitro* tests to establish bioequivalence supports the FDA's interpretation that Congress contemplated the approval of generic drugs through the ANDA process absent absorption testing. Given the lack of evidence in the record regarding whether the effectiveness of NSEDs can be measured through absorption testing,[12] we are constrained to conclude based on the record before us that this provision is a further indication of the ambiguity of section 355(j)(7)(B).

The sparse legislative history of the Act regarding the intended meaning of bioequivalent does not alter our conclusion that section 355(j)(7)(B) is ambiguous. The only legislative history explaining bioavailability and bioequivalent is a footnote reference to the FDA's 1977 regulatory definitions of bioavailability and bioequivalent drug products, respectively codified at 21 C.F.R. §§ 320.1(a) and 320.1(e) (1977). H.R.Rep. No. 98–857, 98th Cong., 2nd Sess. pt. I, *reprinted in* 1984 U.S.S.C.A.N. at 2664.

### IV.

Given our holding that section 355(j)(7)(B) is ambiguous, we must review the FDA's

---

**10.** The parties instruct us that bioequivalence is universally understood to mean comparable bioavailability, suggesting that there is some relationship between the terms that is essential to our interpretation of section 355(j)(7)(B). This notion, however, is thwarted by the dependency of the parties' explanations on the interpretation ascribed to the term bioequivalent. Schering argues that a bioequivalent generic drug must possess comparable rates of absorption to its pioneer drug counterpart. Relying on Congress' use of "absorption" in describing both "bioavailability" and "bioequivalent," Schering contends that "bioequivalent," like "bioavailability," must be read as an exclusive definition. The FDA views "bioequivalent" drugs as drugs possessing comparable efficacy, which can be determined by any appropriate method, that may, but does not necessarily, include measurements of drug absorption. Rather than providing the intended

clarification, these seemingly plausible technical explanations advanced by the parties further illustrate the ambiguity of section 355(j)(7)(B).

**11.** *In vitro* studies are conducted in an artificial environment such as in laboratory test tubes. *In vitro* tests do not measure absorption. *In vivo* studies are conducted in the human body to determine drug safety and effectiveness.

**12.** In fact, neither party could state with certainty whether the absorption of NSEDs could be measured through any means. Of course, we recognize that the FDA's position is that measuring the absorption of NSEDs is of no import in determining bioequivalence because NSEDs do not depend on absorption to derive their effectiveness.

interpretation of that section to determine whether it is a permissible construction of the Act. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If the FDA's reading of the statute fills a gap or defines a term in a way that is reasonable in light of the congressional purpose in enacting the statute, we must defer to the FDA's interpretation. *See NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.,* —— U.S. ——, ——–——, 115 S.Ct. 810, 813–14, 130 L.Ed.2d 740 (1995); *Sekula v. Federal Deposit Insurance Corp.,* 39 F.3d 448, 451–52 (3d Cir.1994). In reviewing the FDA regulation interpreting the Act, we may draw from the language of the statute, the legislative history, the agency regulations adopted to implement the statute and the agency comments regarding the regulations. *West v. Sullivan,* 973 F.2d 179 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2934, 124 L.Ed.2d 684 (1993).

We find the FDA regulation interpreting section 355(j)(7)(B) to be a reasonable construction of the Act. *See* 21 C.F.R. § 320.1(e) (1994). The legislative history expresses congressional desire that the Act provide a means for extending the abbreviated approval process for generic versions of pioneer drugs approved pre–1962 to generic versions of drugs approved post–1962. H.R.Rep. No. 98–857, 98th Cong., 2nd Sess. pt. I, *reprinted in* 1984 U.S.S.C.A.N. at 2647. The House Report provides:

> The purpose of Title I of the Bill is to make available more low cost generic drugs by establishing a generic drug approval process for pioneer drugs first approved after 1962. Under current law, there is a generic drug approval procedure for pioneer drugs approved before 1962, but not for pioneer drugs approved after 1962.

> Title I of the bill generally extends the procedures used to approve generic copies of pre–62 drugs to post–62 drugs. Generic copies of any drugs may be approved if the generic is the same as the original drug or so similar that FDA has determined the

differences do not require safety and effectiveness testing.

*Id.* at 2647–48. *See also Drug Price Competition and Patent Term Restoration Act of 1984,* Senate Comm. on Labor and Human Resources, 98th Cong., 2nd Sess., 1 (June 28, 1984) (opening statement of Sen. Hatch: "The FDA currently has an ANDA practice for pre–1962 drugs. This bill extends that practice to post–1962 drugs."). Although the Act mandated a showing of bioequivalence for approval, there is no evidence that Congress intended to limit the discretion of the FDA in determining when drugs were bioequivalent for purposes of ANDA approval. To the contrary, the expressed desire of Congress was to extend the then-current FDA abbreviated application practices to drugs first approved post–1962.

Congress' reliance on the FDA's 1977 regulations is significant. In addition to defining bioavailability and bioequivalent, the 1977 regulations set forth several studies and tests required for approval. *See* 21 C.F.R. §§ 320.23, 320.24, 320.53 and 320.57 (1990). These regulations are indicative of the "practice" Congress intended to extend to drugs first approved after 1962. The mere fact that Congress made the establishment of bioequivalence mandatory in the Act does not evidence an intent to limit the established testing practices of the FDA.

In adopting the challenged regulations, the FDA stated its disagreement with commentators that blood levels were always an appropriate or necessary measurement of bioequivalence. Abbreviated New Drug Application Regulations, Final Rule, 57 Fed.Reg. 17,950, 17,972 (April 28, 1992). Rather, the FDA stated its preferred method was to determine bioequivalence on a case-by-case basis depending on the drug under consideration for approval pursuant to an ANDA. *Id.* The FDA is the agency charged with implementing the Food, Drug and Cosmetic Act as amended. Its judgments as to what is required to ascertain the safety and efficacy of drugs fall squarely within the ambit of the FDA's expertise and merit deference from us. As such, the FDA's interpretation of section 355(j)(7)(B) as not limiting its discretion to determine what tests or studies would

provide it with appropriate information from which to determine bioequivalence is a reasonable construction of the Act.

## V.

Schering also challenged the district court's denial of its request that the FDA be enjoined from releasing, pursuant to section 355(*l*)(5), confidential safety and efficacy data (which Schering considers trade secret information) pertaining to Schering's pioneer NSEDs. 21 U.S.C.A. § 355(*l*)(5) (West Supp.1994). *See supra* note 4. The FDA is required under the terms of section 355(*l*)(5) to release data at specific times for drugs named in an ANDA application. 21 U.S.C.A. § 355(*l*)(5) (West Supp.1994).

Schering's request for injunctive relief was dependent on its position that NSEDs were not subject to approval through the ANDA process. Our affirmance of the FDA's interpretation of section 355(j)(7)(B), however, permits the approval of NSEDs through the ANDA process. Schering's request for injunctive relief based on the fact that the ANDA process did not apply to NSEDs, therefore, was appropriately denied.

## VI.

■ Schering challenges the district court's conversion of the FDA's Motion for Judgment on the Pleadings to a motion for summary judgment pursuant to Rule 56 without providing Schering with a "reasonable opportunity" to respond as required by Rule 12(c) of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 12(c) and 56. Schering's concern stems from the FDA's submission of the Declaration of Donald Hare with its reply to Schering's opposition to its motion and the uncertainty of whether the district court gave any weight to the factual Declaration in entering summary judgment in favor of the FDA. The district court did not address the Declaration in its opinion. The confusion results from the district court's incorporation of the reasoning of Judge Boudin's opinion, which is based on a different record and references the Declaration.

We have held that the district court, prior to converting a Rule 12 motion to a motion for summary judgment, must provide the parties with a reasonable opportunity to submit materials appropriate for a summary judgment proceeding. *See Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 284 (3d Cir.), *cert. denied sub nom, Altran Corp. v. Ford Motor Co.,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). If notice is not given but the error is harmless, reversal is not required. *Id.* Here, Schering itself recognizes that the exclusivity of the statutory definition of bioequivalence is a legal question. The Declaration of Donald Hare was not material to our determination that section 355(j)(7)(B) is non-exclusive; therefore, we find that to the extent any error might have been committed by the district court, such error was harmless.

## VII.

We will affirm the district court's entry of summary judgment in favor of the FDA on grounds that section 355(j)(7)(B) is ambiguous but that the FDA interpretation of that provision embodied in its regulation at 21 C.F.R. § 320.1(e) (1994) is reasonable. We will also affirm the district court's denial of Schering's request for injunctive relief.