COWEN, Circuit Judge,
dissenting:
I respectfully dissent because I believe the majority has committed two errors in its analysis. First, it has insufficiently recognized the distinction in standing jurisprudence between administrative review cases and private right of action cases, such as this one. Second, the majority has not adequately considered the statutory language of both the Lead-Based Paint Poisoning Prevention Act (“LPPPA”), 42 U.S.C. § 4822(a)(1), and the Residential Lead-Based Paint Hazard Reduction Act of 1992 (“Title X”), 42 U.S.C. §§ 4851 et seq. Read together, the language of these statutes demonstrates that Congress intended that the LPPPA would not benefit the Davises. While the majority correctly observes that one asserting standing need not show that Congress intended to benefit him, I believe that when Congress has expressly indicated its intent not to benefit a particular plaintiff, the standing inquiry is at an end. I discuss these points in turn.
I.
As the majority notes, the question for determination is “ “whether the interest *102 sought to be protected by the [Davises] is arguably within the zone of interests to be protected or regulated by the statute ... in question.’ ” Bennett v. Spear, — U.S.-, 117 S.Ct. 1154, 1161 (1997) (quoting Association of Data Processing Serv. Organizations v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)) (alterations added); see Majority slip op. at 101. The majority makes much of the statement by the Court in Clarke v. Securities Indus. Ass’n, 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987), that “[t]he test is not meant to be especially demanding.” The majority emphasizes this passage from Clarke, see Majority slip op. at 97, and repeats it no less than three times, see id. at 97, 98-99, 101.
Importantly, Clarke, from which the “not ... especially demanding” language derives, was a case in which the plaintiff sought review of federal administrative action, specifically a ruling by the Comptroller of Currency. See Clarke, 479 U.S. at 390, 107 S.Ct. at 752. Indeed, every opinion used by the majority to guide it in its application of the zone-of-interests analysis was an administrative review case. See Bennett, — U.S. at -, 117 S.Ct. at 1158 (challenge to ruling by Fish and Wildlife Service); Air Courier Conference of America v. American Postal Workers Union, 498 U.S. 517, 519-20, 111 S.Ct. 913, 915-16, 112 L.Ed.2d 1125 (1991) (challenge to promulgation of regulations by U.S. Postal Service); Data Processing, 397 U.S. at 151, 90 S.Ct. at 829 (action challenging ruling by Comptroller of Currency); UPS Worldwide Forwarding, Inc. v. United States Postal Serv., 66 F.3d 621, 623 (3d Cir.1995) (challenge to promulgation of regulations by U.S. Postal Service), cert. denied, — U.S. -, 116 S.Ct. 1261, 134 L.Ed.2d 210 (1996); Schering Corp. v. Food and Drug Admin., 51 F.3d 390, 391-92 (3d Cir.) (action challenging FDA approval of drug), cert. denied,-U.S.-, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995).
This case, by stark contrast, is not an administrative review case. The Davises assert that they have a private right of action against the PHA pursuant to § 1983 and the LPPPA. As some commentators have recognized, the Supreme Court has strongly implied that “plaintiffs in [private right of action] eases have to meet a higher threshold test in showing that judicial protection of their interests is intended by the statute in question.” William A. Fletcher, The Structure of Standing, 98 Y ALE L.J. 221, 237 n.84 (1988). Indeed, the unanimous Supreme Court recently reiterated the important idea, stemming from Clarke, that “what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the ‘ “ ‘generous review provisions’”^ the APA [Administrative Procedures Act] may not do so for other purposes.” Bennett, — U.S. at-, 117 S.Ct. at 1161 (quoting Clarke, 479 U.S. at 400 n. 16, 107 S.Ct. at 757 n. 16 (quoting Data Processing, 397 U.S. at 156, 90 S.Ct. at 831)); see also Clarke, 479 U.S. at 400 n. 16, 107 S.Ct. at 757 n. 16. (“While inquiries into reviewability or prudential standing in other contexts may bear some resemblance to a ‘zone of interest’ inquiry under the APA, it is not a test of universal application.”). By contrast to its emphasis on the “not ... especially demanding” language, the majority relegates this important concept to a footnote. See Majority slip op. at 97 n.7.
The two private right of action cases in which the Supreme Court has applied zone-of-interests analysis give only limited guidance. See Dennis v. Higgins, 498 U.S. 439, 449, 111 S.Ct. 865, 872, 112 L.Ed.2d 969 (1991); Boston Stock Exchange v. State Tax Comm’n, 429 U.S. 318, 320 n. 3, 97 S.Ct. 599, 602-03 n. 3, 50 L.Ed.2d 514 (1977). In addition, I am unaware of, and the majority has not cited, any private right of action case from this Court offering any extensive zone-of-interest analysis. That is not to say that we have not applied the analysis in non-agency review situations. When we have done so, however, the party whose standing was in question clearly satisfied the zone-of-interests test and we therefore declined to engage in any extensive analysis. See, e.g., In re Grand Jury, 111 F.3d 1066, 1072 (3d Cir.1997) (“The privacy interests the [intervenors] assert are certainly within the ‘zone of interests’ that Title III [of the Omnibus Crime Control and Safe Streets Act of 1968] is intended to protect.”); Stehney v. Perry, 101 F.3d 925, 931 (3d Cir.1996) (“[A]s the *103 target of [National Security Agency] regulatory action, [plaintiffs] interests fall within the zone of interests protected by the constitutional and regulatory provisions on which her case is based.”); Out Front Productions, Inc. v. Magid, 748 F.2d 166, 168 (3d Cir.1984) (“[I]t is clear that businesses that are hindered from forming or from entering a new market come within the zone of interests protected by the antitrust laws....”); American College of Obstetricians and Gynecologists v. Thornburgh, 737 F.2d 283, 303 n. 21 (3d Cir.1984) (“[Increased cost [of insurance] caused by a [statutory] provision directed at [plaintiff] ... places her within the zone of interests of the regulation”), aff'd, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986).
The Clarke Court did give some guidance as to the appropriate application of the zone-of-interests test in a private right of action ease. It wrote:
The difference made by the APA can be readily seen by comparing the “zone of interest” [jurisprudence] with cases in which a private right of action under a statute is asserted in conditions that make the APA inapplicable. See, e.g., Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).
Id. at 400 n. 16, 107 S.Ct. at 758 n. 16; see Fletcher, supra, at 237 n. 84. The reference to Cort and Cannon is somewhat cryptic. The issue in those cases was whether a particular statute granted anyone the right to relief, while in this case, the issue is, assuming arguendo that someone is entitled to relief, whether the Davises are within that class of individuals. As we have explained, the former question goes to whether a cause of action exists (i.e., a question going to the merits) while the latter is a question of standing. See Bowman v. Wilson, 672 F.2d 1145, 1151 n. 10 (3d Cir.1982); Majority slip op. at 94-95. But see David P. Currie, Misunderstanding Standing, 1981 SUP. CT. REV. 41, 43 (arguing that the two issues are identical); Fletcher, supra, at 236-37 (same).
In any event, I will not further attempt to articulate the zone-of-interest analysis to be applied in “cases in which a private right of action under a statute is asserted in conditions that make the APA inapplicable.” Clarke, 479 U.S. at 400 n. 16, 107 S.Ct. at 758 n. 16. Perhaps the difference in approach is largely inarticulable except to say that the test in a private right of action case is more stringent. Further guidance from the Supreme Court on this topic would, of course, be helpful. Suffice it to say that the majority imposes a test that is “not ... especially demanding” in a context where a more demanding test is appropriate.[1]
II.
The second error committed by the majority is its reliance on the legislative history of the LPPPA to the exclusion of the language of both the LPPPA and Title X. This language demonstrates Congress’s intent that individuals in the Davises’ position not be benefited by the LPPPA. The Supreme Court has written that it is not necessary that “there be [any] indication of congressional purpose to benefit the would-be plaintiff’ in order for that plaintiff to meet the zone-of-interests test. Clarke, 479 U.S. at 399-400, 107 S.Ct. at 757. We have reiterated this view. See Schering, 51 F.3d at 395. However, a plaintiff does not meet the zone-of-interests requirement if his “interests are so marginally related to or inconsistent with *104 the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.” Clarke, 479 U.S. at 399, 107 S.Ct. at 757 (emphasis added). In other words, while lack of congressional intent to benefit a particular plaintiff will not be fatal to his claim of standing, a demonstration of congressional intent not to benefit him will be.
In order to answer the zone-of-interests question, it is crucial that we examine the language of “the statutory provision whose violation forms the legal basis for [the] complaint.” Bennett, — U.S. at-, 117 S.Ct. at 1167 (emphasis omitted). As the majority notes, 42 U.S.C. § 4822(a)(1) provides, in part:
The Secretary of Housing and Urban Development ... shall establish procedures to eliminate as far as practicable the hazards of lead based paint poisoning with respect to any existing housing which may present such hazards and which is covered by an application for mortgage insurance or housing assistance payments under a program administered by the Secretary or otherwise receives more than $5000 in project-based assistance under a federal housing program.
(emphasis added).
I will assume that the majority is correct in concluding that this language, standing alone, does not demonstrate Congress’s intent to protect only participants in the section 8 housing assistance program. However, this language does not stand alone. It must be read together with other relevant language in the statutory scheme that Congress has established. In discerning the meaning of the particular provision under which the Davises sue, we are free to “consider any provision that helps us to understand Congress’ overall purposes.” Clarke, 479 U.S. at 401, 107 S.Ct. at 758; see also id. at 396-97, 107 S.Ct. at 755 (noting that Data Processing Court relied on one statute to find plaintiffs suing under different statute had standing).
Totally absent from the majority’s discussion is any mention of Title X. Title X was enacted in 1992 pursuant to Congress’s findings that low level lead poisoning, commonly caused by ingesting lead-based paint, was a problem of national significance, affecting as many as 3 million children under the age of six. See 42 U.S.C. § 4851(1), (4). Congress found that lead-based paint hazards predominated in housing built before 1980, and that as many as 3.8 million American homes contained these hazards. See 42 U.S.C. § 4851(3), (5).
Significantly, Congress did not limit the scope of Title X to housing having some connection to the federal government. Rather, unlike the LPPPA, the statute seeks “to eliminate lead-based paint hazards in all housing.” 42 U.S.C. § 4851a(l) (emphasis added); see Jane Sehukoske, The Evolving Paradigm of Laws on Lead-Based Paint: From Code Violation to Environmental Hazard, 45 S.C. L. REV. 511, 545 (1994); Brett P. Barragate, Note, Time for Legislative Action: Landlord Liability in Ohio for Lead Poisoning of a Tenant, 43 CLEV. S T.L. REV. 529, 535-36 (1995); Karla A. Francken, Comment, Lead-Based Paint Poisoning Liability: Wisconsin Realtors, Residential Property Sellers, and Landlords Beware, 77 MARQ. L. REV. 550, 581 (1994); Jennifer Tiller, Recent Development, Easing Lead Paint Laws: A Step in the Wrong Direction, 18 H ARV. ENVTL. L. REV. 265, 266-67 (1994). Perhaps more significantly, Congress justified the enactment of the more comprehensive Title X in the following terms: “[D]espite the enactment of laws in the early 1970’s requiring the Federal Government to eliminate as far as practicable lead-based paint hazards in federally owned, assisted, and insured housing [i.e., the LPPPA], the Federal response to this national crisis remains severely limited.” 42 U.S.C. § 4851(7); see also Sehukoske, supra, at 545; Tiller, supra, at 266-67.
With regard to private housing, Title X has three major effects. First, it requires disclosure to prospective tenants and buyers of private housing of the hazards of lead-based paint in general, and of any known hazards regarding the property in question. See 42 U.S.C. § 4852d(a)(l), (3); Sehukoske, supra, at 548-49; Barragate, supra, at 536; Francken, supra, at 580-83. Violation of the disclosure provisions results in civil liability. *105 See 42 U.S.C. § 4852d(b); Barragate, supra, at 537; Francken, supra, at 583. Second, Title X “establishes a task force to make recommendations to [the Environmental Protection Agency] regarding the feasibility of assessment of lead-based paint hazards throughout the real estate finance system.” Schukoske, supra, at 549; see 42 U.S.C. § 4852a(e)(l)-(3); Barragate, supra, at 536. The task force also has the responsibility of “recommend[ing] liability standards for landlords and lenders ... and proposing] ways to increase availability of insurance coverage for contractors and alternative compensation systems for poisoning victims.” Schukoske, supra, at 549-50; see 42 U.S.C. § 4852a(c)(6), (7). Finally, Title X provides for the development of standards for the abatement of lead-based paint in residential housing, but largely “leaves to the states the task of developing standards and statutory schemes on lead paint.” Schukoske, supra, at 547-48; see 15 U.S.C. § 2682(c)(1).
Examination of the LPPPA and Title X together demonstrates that this case is wholly unlike those cases upon which the majority relies. Each of those eases involved “[plaintiffs who suffered] economic injury from unlawful competition” alleged to be prohibited by “ ‘entry restricting’ statutes.’ ” Sphering, 51 F.3d at 395. Accordingly, in those cases, “the plaintiffs interests in protecting its competitive position ... coincide[d] with the legislative purpose of imposing an entry restriction.” Id.; see Clarke, 479 U.S. at 403, 107 S.Ct. at 759; Data Processing, 397 U.S. at 155-56, 90 S.Ct. at 831; UPS Worldwide, 66 F.3d at 630-31. Thus, it was at least “arguable” that the furtherance of the plaintiffs interest in each of those cases was one beneficial side effect implicit in the legislation in question, even if it was not the purpose contemplated by Congress.
Here, by contrast, the plaintiffs’ interests do not “coincide,” but instead conflict, with the purpose of the statute pursuant to which they bring their action. Congress has enacted two statutes that, read together, demonstrate that Congress sought to protect the interests of those in plaintiffs’ position by only one of those statutes. Yet the majority finds that the Davises have standing to assert rights under the other statutory provision. The majority thereby fails to heed the Supreme Court’s instruction that the interests of a plaintiff asserting standing must not be “inconsistent with the purposes implicit in the statute.” Clarke, 479 U.S. at 399, 107 S.Ct. at 757.
This result is not only perplexing but is also at odds with our system of separation of powers and our tradition of judicial restraint. Congress, through the give-and-take of the political process that resulted in the enactment of the LPPPA and Title X, has created a framework that delicately balances the competing interests of those exposed to the hazards of lead-based paint and those who have the power to abate or eliminate those hazards. True, Title X might not protect residents of private housing to the same extent that the LPPPA protects residents of federally-owned and -assisted housing. However, that the Congress chose to strike a somewhat different balance in each context is none of our concern — it is a policy choice that Congress was entitled to make. We are in no position to upset with an expansive view of the zone-of-interests test the delicate balance that Congress has wrought. That is precisely what the prudential standing requirements were designed to obviate. See Bennett, — U.S. at-, 117 S.Ct. at 1161; In re Grand Jury, 111 F.3d at 1072.
III.
I agree with the majority on one crucial point: nothing in the Court’s opinion should be construed to mean that the Davises have a cause of action against the PHA. See Majority slip op. at 94-95. But see id. at 100-101 (citing cases that hold that tenants in federally-assisted housing may sue to enforce LPPPA as support for unrelated proposition that Davises possess standing). The majority merely holds that the Davises’ interests are “arguably within the zone of interests sought to be protected by” the LPPPA. Data Processing, 397 U.S. at 153, 90 S.Ct. at 830 (emphasis added). Should the PHA wish to file a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to FED. R. CIV. P. 12(b)(6), the questions for the district court will become *106 whether the Davises’ interests are actually within that zone, see Chem Serv., Inc. v. Environmental Monitoring Sys. Laboratory-Cincinnati, 12 F.3d 1256, 1263 (3d Cir.1993), and whether a private right of action lies pursuant to the LPPPA and § 1983 at ah.
IY.
Because I do not agree with the majority that the Davises’ interests are even “arguably within the zone of interests” the LPPPA seeks to protect, I respectfully dissent.

. The prudential .standing requirements "are 'founded in concern about the proper — and properly limited — role of the courts in a democratic society.’ ” Bennett v. Spear, -U.S. -, -, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997) (quoting Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). I concede that, given this concern, it is somewhat counterintuitive that plaintiffs seeking to enforce a private right of action should be subject to a more stringent zone-of-interests test than those plaintiffs seeking review of administrative agency action. One would assume that a plaintiff in the latter type of case, having the opportunity to challenge agency action through the political branches of government, would be subject to the more stringent requirement. Nonetheless, we are bound by language in Supreme Court precedent indicating that a more stringent zone-of-interests test is applicable in non-agency review cases. See Bennett,-U.S. at-, 117 S.Ct. at 1161; Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 758 n. 16, 93 L.Ed.2d 757 (1987).