

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-15-1995

# UPS v US Postal Service

Precedential or Non-Precedential:

Docket 94-7423

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"UPS v US Postal Service" (1995). *1995 Decisions.* Paper 255.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/255

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 94-7423
_____



UPS WORLDWIDE FORWARDING, INC.

v.

UNITED STATES POSTAL SERVICE,
                              Appellant

AIR COURIER CONFERENCE OF AMERICA/INTERNATIONAL COMMITTEE
                        (Intervenor in District Court)


_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 93-cv-00340)
_____


Argued March 10, 1995

Before:  BECKER, SCIRICA, and WOOD*, Circuit Judges

(Filed  September 15, 1995)

JONATHAN R. SIEGEL, ESQUIRE (ARGUED)
DOUGLAS N. LETTER, ESQUIRE
United States Department of Justice
Civil Division, Appellate Staff
10th & Pennsylvania Avenue, N.W.
Room 3617 MAIN
Washington, D.C. 20530-0001

  Attorneys for Appellant,
  United States Postal Service

*The Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Judicial Circuit, sitting by designation.

JOHN E. McKEEVER, ESQUIRE (ARGUED)
ROBERT L. KENDALL, JR., ESQUIRE
KAREN L. TOMLINSON, ESQUIRE
Schnader, Harrison, Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103

   Attorneys for Appellee,
   UPS Worldwide Forwarding, Inc.


L. PETER FARKAS, ESQUIRE
Graham & James
2000 M Street, N.W., Suite 700
Washington, D.C. 20036

   Attorney for Appellee,
   Air Courier Conference of America/International Committee

———————————————

OPINION OF THE COURT

———————————————


SCIRICA, Circuit Judge.


In this case, UPS Worldwide Forwarding seeks to prevent the United States Postal Service from implementing a new service for customers that ship significant quantities of international mail.  In response, the Postal Service attacks UPS's standing to bring suit.  The district court determined that UPS had standing but that the Postal Service exceeded its authority in promulgating the new program.  We will reverse.

I.

In July 1992, the Postal Service announced the creation, on an interim basis, of an International Customized

3

Mail ("ICM") service. See 57 Fed. Reg. 30651 (1992). Despite protests from UPS, a large delivery company that competes with the Postal Service, the Postal Service adopted the ICM program on a permanent basis in May 1993. See 58 Fed. Reg. 29778 (1993).

Under the ICM service, qualifying international mailers negotiate individualized service agreements with the Postal Service to establish the kind of services to be provided and the rate of postage. To qualify for the service, international mailers must be capable, on an annual basis, of mailing at least one million pounds of international mail or paying at least two million dollars in international postage. Id.

Two months after publication of the permanent regulation, UPS filed suit in the District of Delaware, alleging the ICM service violated several provisions of the Postal Reorganization Act ("PRA"), Pub. L. No. 91-375, 84 Stat. 719 (1970) (codified at 39 U.S.C. §§ 101-6440). The Postal Service disagreed, claiming that its promulgation of the ICM regulation did not exceed its statutory authority. The Postal Service also contended that UPS lacked standing to file the action. Air Courier Conference of America/International Committee ("ACCA"), an unincorporated association of firms engaged in letter and parcel delivery services, then filed a motion to intervene.

Subsequently, the district court granted UPS's motion for summary judgment.

4

UPS Worldwide Forwarding, Inc. v. United States Postal Serv., 853 F. Supp. 800 (D.

1994).  First, the court held that UPS had standing to challenge the Postal Service

program.  Id. at 804.  Second, the court found the ICM service violated several se

of the PRA, codified at 39 U.S.C. §§101(d),° 403(b)-(c),° and 407(a)° (1988), and is

injunction barring the Postal Service from operating the program.  Id. at 804-07.

the court granted ACCA's motion to intervene.  Id. at 806-07.  The Postal Service

appealed.

The district court had jurisdiction under 28 U.S.C. §§1331 and 1339 (1988

39 U.S.C. § 409(a) (1988).  We have jurisdiction under 28 U.S.C. § 1291 (1988).  Ou

---

° Section 101 provides statements of "Postal policy":

. . . .

(d)  Postal rates shall be established to apportion the costs of all
postal operations to all users of the mail on a fair and equitable
basis.

° Section 403 provides the "[g]eneral duties" of the Postal Service:

(b)  It shall be the responsibility of the Postal Service --

. . . .

(2) to provide types of mail service to meet the needs of
different categories of mail and mail users . . . .

. . . .

(c)  In providing services and in establishing classifications, rates,
and fees under this title, the Postal Service shall not, except as
specifically authorized in this title, make any undue or unreasonable
discrimination among users of the mails, nor shall it grant any undue
or unreasonable preferences to any such user.

° Section 407 governs "[i]nternational postal arrangements":

(a)  The Postal Service, with the consent of the President, may
negotiate and conclude postal treaties or conventions, and may
establish the rates of postage or other charges on mail matter
conveyed between the United States and other countries.  The decisions
of the Postal Service construing or interpreting the provisions of any
treaty or convention which has been or may be negotiated and concluded
shall, if approved by the President, be conclusive upon all officers
of the Government of the United States.

review of these issues of standing and statutory construction is plenary. See Poly

Int'l Corp. v. Krigger, 5 F.3d 1522, 1530 n.19 (3d Cir. 1993) ("We have plenary rev

the district court's judgment on standing."); Resolution Trust Corp. v. Cityfed Fir

Corp., 57 F.3d 1231, 1237 (3d Cir. 1995) ("Our review of the construction of federa

statutes is plenary.").

## II.

Before addressing standing and the merits, we consider the history of the

statutory sections and regulations at the core of this dispute. This review takes

more than two hundred years.

In 1789, the First Congress established a Post Office and provided for th

appointment of a Postmaster General. See Act of Sept. 22, 1789, ch. 16, 1 Stat. 70

National Ass'n of Greeting Card Publishers v. United States Postal Serv., 462 U.S.

813 (1983). Three years later, Congress approved a statute that "established basic

rates, granted the Post Office Department a monopoly on mail delivery and authorize

creation of post roads." See Joseph W. Belluck, Increasing Citizen Participation i

Postal Service Policy Making, 42 Buff. L. Rev. 253, 257 (1994); see also Act of Feb

1792, ch. 7, 1 Stat. 232. Under this Act, Congress set the rates not only for dome

mail, but also for letters and parcels sent abroad. Id. § 26, 1 Stat. at 239.

In 1825 and 1827, Congress passed laws prohibiting the private carriage o

letters via stage, boat, horseback, or on foot, thereby "target[ing] transportation

mail which even then was contracted out to private carriers." Air Courier Conferer

America v. American Postal Workers Union, 498 U.S. 517, 526 (1991). In the 1825 st

Congress once again set the rate for domestic and international mail. See Act of N

1825, ch. 64, §§ 13, 34, 4 Stat. 102, 105, 112.

Despite the prohibitions on private carriers of mail, "high postal rates

private expresses to make substantial inroads into the domestic market for delivery

letters and the 1825 and 1827 Acts proved unsuccessful in prosecuting them." Air C

6

Conference, 498 U.S. at 526.  In response, Congress passed a series of laws between

and 1851 reducing postage rates.  Belluck, supra, at 258.  Congress believed the 18

which strengthened the postal monopoly and reduced rates, "would have the dual virt

driving private expresses out of business and increasing mail volume of the Post Of

Air Courier Conference, 498 U.S. at 527 (citing Act of Mar. 3, 1845, 5 Stat. 732).

1851 Act continued the trend of reducing rates, but for the first time permitted th

international rates set by Congress to be changed via "postal treaty or convention

concluded or hereafter to be made."  See Act. of Mar. 3, 1851, ch. 20, § 1, 9 Stat.

588.  The Act also provided:

> [T]he Postmaster General, by and with the advice and consent of the President of the United States, shall be, and he hereby is, authorized to reduce or enlarge, from time to time, the rates of postage upon all letters and other mailable matter conveyed between the United States and any foreign country, for the purpose of making better postal arrangements with other governments, or counteracting any adverse measures affecting our postal intercourse with foreign countries . . . .

Id. § 2, 9 Stat. at 589.  In 1872, Congress combined into one statutory section the

authority of the Postmaster General to negotiate postal treaties and change interna

rates.  See Act of June 8, 1872, ch. 335, § 167, 17 Stat. 283, 304 ("[T]he Postmast

General, by and with the advice and consent of the President, may negotiate and con

postal treaties or conventions, and may reduce or increase the rates of postage on

matter conveyed between the United States and foreign countries.").

Although technology advanced rapidly over the next century, the organizat

postal services remained largely unchanged.  Congress continued to set domestic mai

rates, see 39 U.S.C. chs. 51–69 (1964), and the Postmaster General retained the aut

to change international rates, with the advice and consent of the President.  Id. §

Congress also maintained the Post Office monopoly over mail delivery in an effort t

revenues high and mailing costs low.  Air Courier Conference, 498 U.S. at 527–28.

By 1970, however, the Post Office "faced a major financial crisis" that r[...] in significant backlogs of mail and postal worker strikes.  Belluck, supra, at 262, [...] Congress responded by passing the Postal Reorganization Act, an overhaul of the ent[...] postal system that represented "a dramatic break with the past."  See Mail Order As[...] America v. United States Postal Serv., 986 F.2d 509, 512 (D.C. Cir. 1993); see also[...] No. 1104, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.C.C.A.N. 3649, 3651-52[...]

The PRA "abolished the Post Office Department, which since 1789 had admin[...] the Nation's mails," and replaced it with the United States Postal Service, an inde[...] agency within the executive branch.  National Ass'n of Greeting Card Publishers, 46[...] at 813.  The Act divested Congress of control over postal rates, id., with domestic[...] set through a complex process involving the Postal Service, Postal Rate Commission, [...] Governors of the Postal Service, and international rates set by "[t]he Postal Servi[...] with the consent of the President."  Air Courier Conference of America v. United St[...] Postal Serv., 959 F.2d 1213, 1216-23 (3d Cir. 1992) (quoting 39 U.S.C. § 407(a)).  [...] Congress also ordered the Postal Service to become self-sustaining, generating enou[...] revenue to cover its expenses, thereby "launching 'the Postal Service into the comm[...] world.'"  Loeffler v. Frank, 486 U.S. 549, 556 (1988) (quoting Franchise Tax Bd. v. [...] States Postal Serv., 467 U.S. 512, 520 (1984)); see also H.R. No. 1104, 91st Cong., [...] Sess., reprinted in 1970 U.S.C.C.A.N. at 3665.  At the same time, the Act generally[...] required fairness and forbade undue discrimination or preferences in the establishm[...] postal rates and services.  See 39 U.S.C. §§ 101(d), 403(c).

The PRA continued the Postal Service's statutory monopoly "over the carri[...] letters in and from the United States," see Air Courier Conference, 498 U.S. at 519[...] (citing 18 U.S.C. §§ 1693-1699 and 39 U.S.C. §§ 601-606), but it permitted the Post[...] Service to suspend its monopoly "where the public interest requires."  Id. (citing [...] U.S.C. § 601(b)).  In 1979, the Postal Service suspended its monopoly over "extreme[...] urgent letters" sent within the United States and abroad, thus allowing private cou[...]

such as UPS to compete with it in the overnight delivery of letters.  See id. (cit[i]

C.F.R. § 320.6).  In 1986, it went further by generally suspending its monopoly ove[r]

sent abroad.  See id. at 519-20; see also 39 C.F.R. §320.8.[°]

III.

Article III of the Constitution restricts the "judicial power" of the Uni[ted]

States to the resolution of "cases" and "controversies."  See <u>Valley Forge Christia[n]</u>

<u>College v. Americans United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 4[     ]

(1982).  Subsumed within this restriction is the requirement that "a litigant have [a]

'standing' to challenge the action sought to be adjudicated in the lawsuit."  <u>Id.</u>

Standing has constitutional and prudential components, both of which must be satisf[ied]

before a litigant may seek redress in the federal courts.  <u>Id.</u>; <u>Wheeler v. Traveler[s]</u>

<u>Co.</u>, 22 F.3d 534, 537 (3d Cir. 1994).

A.

Earlier this year, the Supreme Court reiterated the three elements necess[ary to]

satisfy "the irreducible constitutional minimum of standing":

> First, the plaintiff must have suffered an 'injury in fact' –– an
> invasion of a legally protected interest which is (a) concrete and
> particularized, and (b) actual or imminent, not conjectural or
> hypothetical.  Second, there must be a causal connection between the
> injury and the conduct complained of . . . . Third, it must be likely,
> as opposed to merely speculative, that the injury will be redressed by
> a favorable decision.

<u>United States v. Hays</u>, 115 S. Ct. 2431, 2435 (1995) (quoting <u>Lujan v. Defenders of</u>

<u>Wildlife</u>, 504 U.S. 555, 560-61 (1992)).

In this case, there is no dispute that UPS meets the constitutional stand[ing]

requirements.  First, as a competitor of the Postal Service with authority to compe[te in]

the international parcel delivery market,[°] UPS stands to lose clientele lured to th[e]

---

[°]Section 320.8 suspends the postal monopoly for "international remailing," which in[cludes]
"bypassing the Postal Service and using private courier systems to deposit with for[eign]
postal systems letters destined for foreign addresses."  <u>Air Courier Conference</u>, 49[8 U.S.]
at 520.
[°]<u>See</u> 39 C.F.R. §§ 320.6, 320.8 (1994); <u>see also</u> <u>supra</u> part II.

9

Postal Service by the ICM service.  Although UPS may not have demonstrated any lost

business yet, the "injury in fact" component of standing merely requires that such

be "imminent."  Id.; see also Schering Corp. v. FDA, 51 F.3d 390, 395 (3d Cir. 1995

(noting that "threatened injury" suffices for Article III standing).  Second, the

requisite "causal connection" between UPS's injuries and the Postal Service's condu

clear; in fact, the Postal Service created the ICM program with the express purpose

"attract[ing] customers that currently use its competitors and [that] would not oth

use the Postal Service for their international mailings.  If the Postal Service is

successful, the additional volume will come from competitors, not from the Postal

Service's other international services."  58 Fed. Reg. 29778, 29780.  Finally, a de

favorable to UPS will undoubtedly redress its injuries.  If we uphold the district

decision for UPS, the Postal Service will not be able to implement the ICM service,

UPS cannot lose customers to a program that does not exist.

B.

In addition to the Article III standing requirements, federal courts have

developed prudential standing considerations "that are part of judicial self-govern

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  These prudential standin

require that:

> (1) a litigant "assert his [or her] own legal interests rather than
> those of third parties," (2) courts "refrain from adjudicating
> 'abstract questions of wide public significance' which amount to
> 'generalized grievances,'" and (3) a litigant demonstrate that her
> interests are arguably within "the zone of interests" intended to be
> protected by the statute, rule or constitutional provision on which
> the claim is based.

Wheeler v. Travelers Ins. Co., 22 F.3d 534, 538 (3d Cir. 1994) (citations omitted);

also Valley Forge Christian College v. Americans United for Separation of Church &

Inc., 454 U.S. 464, 474-75 (1982).[0]

---

[0]Intervenor ACCA contends that the Postal Service has waived its right to object to
prudential standing because of its notice in the Federal Register announcing the IC
service:

10

Since the Postal Rate Commission does not have jurisdiction to
challenge over international rates, the Postal Service's competitors
cannot challenge ICM or any other international rates in that forum.
However, the Postal Service's competitors can seek judicial review of
ICM rates just like they can seek judicial review of other
international rates.

58 Fed. Reg. 29778, 29782 (1993).

Despite the Postal Service's statement inviting judicial review, it is un[clear]
whether prudential standing may be waived.  The Supreme Court has given mixed signa[ls.]
Craig v. Boren, 429 U.S. 190, 192-94 (1976), the Court hinted that the first pruden[tial]
standing requirement -- which requires a party to assert its own rights, not the ri[ghts of]
others -- could be waived by a defendant.  See Elkin v. Fauver, 969 F.2d 48, 52 n.1[ (3d]
Cir.) (citing Craig for the proposition that "prudential standing [is] not
jurisdictional"), cert. denied, 113 S. Ct. 473 (1992); Lindley for Lindley v. Sulli[van,]
889 F.2d 124, 128-29 (7th Cir. 1989) (similarly citing Craig).  But, in later cases[, the]
Supreme Court has indicated plaintiffs always must satisfy the prudential standing [rules.]
In Bender v. Williamsport Area School District, 475 U.S. 534, 546 n.8 (1986) (citin[g Warth]
v. Seldin, 422 U.S. 490, 517-18 (1975)), the Court stated:

The rules of standing, whether as aspects of the Art. III case-or-
controversy requirement or as reflections of prudential considerations
defining and limiting the role of the courts, are threshold
determinants of the propriety of judicial intervention.  It is the
responsibility of the complainant clearly to allege facts
demonstrating that he is a proper party to invoke judicial resolution
of the dispute and the exercise of the court's remedial powers.

Furthermore, recent Supreme Court opinions have held broadly that a party may never [waive]
standing, but they have not expressly cited prudential standing.  See, e.g., United [States]
v. Hays, 115 S. Ct. 2431, 2435 (1995) ("The question of standing is not subject to [waiver]
. . . ."); National Org. for Women, Inc. v. Scheidler, 114 S. Ct. 798, 802 (1994)
("Standing represents a jurisdictional requirement which remains open to review at [all]
stages of the litigation.").

From these cases, many of our sister circuits have determined that pruden[tial]
standing cannot be waived.  See Community First Bank v. National Credit Union Admin[., 41]
F.3d 1050, 1053 (6th Cir. 1994) ("We find no authority for the plaintiffs' argument [that]
prudential standing requirements may be waived by the parties.  Recognizing a disti[nction]
between prudential and constitutional standing requirements in this context might g[ive]
careless parties power to override congressional intent."); Animal Legal Defense Fu[nd,]
Inc. v. Espy, 29 F.3d 720, 723 n.2 (D.C. Cir. 1994) ("Standing, whether constitutio[nal or]
prudential, is a jurisdictional issue which cannot be waived or conceded."); Thomps[on v.]
County of Franklin, 15 F.3d 245, 248 (2d Cir. 1994) (quoting National Wildlife Fed'[n v.]
United States, 626 F.2d 917, 924 (D.C. Cir. 1980)) ("[A]ppellee's purported waiver [of the]
prudential standing challenge is necessarily ineffective because standing implicate[s our]
federal jurisdiction.").  At least one circuit has resolved the issue differently. [ See]

11

The first step in satisfying prudential standing is for the litigant to demonstrate that it has asserted its "own legal interests rather than those of thir parties." Wheeler, 22 F.3d at 538; see also Valley Forge, 454 U.S. at 474; Warth v Seldin, 422 U.S. 490, 499 (1975). The Postal Service alleges that UPS does not mee first requirement because it has sued under provisions of the PRA that purportedly to protect users of the mail, not competitors: "Because plaintiff does not claim t injured as a mailer, it may not challenge alleged violations of statutory provision protect mailers from undue discrimination." Appellant's Brf. at 14.

We believe the Postal Service confuses this first element of prudential standing, that plaintiff assert its own rights, with the third element, that plaint complaint be within the "zone of interests" the statute was designed to protect or regulate. See, e.g., Director, Office of Workers' Compensation Programs v. Newport Shipbuilding & Dry Dock Co., 115 S. Ct. 1278, 1283 (1995). Under the zone of inter

Lindley for Lindley v. Sullivan, 889 F.2d 124, 128–29 (7th Cir. 1989) ("Because the Secretary failed to suggest in the district court that prudential considerations sh bar David from suing on his parents' behalf, we cannot consider these arguments her

Our jurisprudence has not decisively settled the matter. Recently, we ra the matter of constitutional and prudential standing, even when the parties agreed standing existed. See Wheeler v. Travelers Ins. Co., 22 F.3d 534, 537 (3d Cir. 199 (citation omitted) ("[W]e have an independent obligation to consider jurisdictional issues, and 'the doctrine of standing . . . goes to the subject matter jurisdiction district court and the validity of its judgment ab initio.'"); see also Bennun v. P State Univ., 941 F.2d 154, 168 (3d Cir. 1991) (referring to "those constitutional a prudential [standing] limitations that restrict a court's power to act and so must resolved before we can proceed further on the merits"), cert. denied, 502 U.S. 1066 (1992). But in Elkin, 969 F.2d at 52 n.1, while defendants did not challenge plain standing, we analyzed the issue because of our "independent obligation to ensure th federal jurisdiction is present in cases that come before us." Although we found t plaintiff satisfied the Article III standing requirements, we declined to decide wh he satisfied the prudential rules. Id.; see also Ditri v. Coldwell Banker Resident Affiliates, Inc., 954 F.2d 869, 872 (3d Cir. 1992) ("We find it unnecessary to deci so-called standing issue which would, at best, only involve prudential standing.").

Because we determine that UPS has standing here, we need not resolve the of whether prudential standing may be waived.

test, a plaintiff must demonstrate the "interest he seeks to vindicate is arguably

the 'zone of interests to be protected or regulated by the statute' in question."

(citations omitted); see also infra part III.B.3.  The first element only mandates

litigants assert their own legal rights, not those of others.  Wheeler, 22 F.3d at

This test generally comes into play in those cases in which a party seeks to challe

agency action that affects another party.  See, e.g., id. at 539 (holding that plai

"fails to satisfy the prudential requirements for standing because she improperly i

seeking to vindicate the rights of a third-party, the United States").

In this case, as we have noted, the Postal Service has granted UPS and ot

delivery companies the right to compete in the delivery of international mail.  See

C.F.R. §§ 320.6, 320.8 (1994); see also supra part II.  If the ICM service is permi

UPS alleges it would be injured in the exercise of its right to deliver such mail,

the Postal Service has not contested on appeal.  Therefore, we believe UPS is prope

asserting its "own legal interests."  Wheeler, 22 F.3d at 538.

### 2.

The second prudential standing consideration admonishes courts to "refrai

adjudicating 'abstract questions of wide public significance' which amount to 'gene

grievances.'"  Id.  For example, the Supreme Court has denied standing, inter alia,

cases in which plaintiffs sued to protest the Vietnam War, see Schlesinger v. Reser

Comm. to Stop the War, 418 U.S. 208, 220 (1974) ("[S]tanding to sue may not be pred

upon an interest of the kind alleged here which is held in common by all members of

public . . . .");  or to challenge the legality of the Central Intelligence Agency,

United States v. Richardson, 418 U.S. 166, 175 (1974) (citation omitted) (rejecting

plaintiff's attempt to "employ a federal court as a forum in which to air his gener

grievances about the conduct of government").  We hold that this dispute is not the

of "generalized grievance" that poses a barrier to standing.

### 3.

13

Finally, litigants must demonstrate their interests fall "arguably within

'zone of interests to be protected or regulated by the statute' in question." See

News Shipbuilding, 115 S. Ct. at 1283 (citations omitted); see also Wheeler, 22 F.3

538. This element represents the primary focus of the parties' dispute over standi

In Association of Data Processing Service Organizations, Inc. v. Camp., 3

150, 153 (1970), the Supreme Court formulated the "zone of interests" element of st

In Data Processing, sellers of data processing services challenged a Comptroller of

Currency ruling that permitted national banks to offer data processing services to

customers. Plaintiffs contested the ruling as contrary to a statute barring bank s

corporations from engaging in "any activity other than the performance of bank serv

for banks." Id. at 155 (citation omitted). The Supreme Court found plaintiffs had

standing because their interests were within the "zone of interests to be protected

regulated by the statute or constitutional guarantee in question." Id. at 153.[0]

Similarly, in Clarke v. Securities Industry Ass'n, 479 U.S. 388 (1987), t

Court held a trade association of securities brokers had standing to challenge a de

by the Comptroller that national banks could operate discount brokerage services in

locations outside of their home states. Id. at 394-403. The Comptroller claimed t

trade association did not have standing because it was not within the "zone of inte

of the McFadden Act, which limited national banks to conducting general business in

home states. But the Court held it was essential to consider the "zone of interest

both the McFadden Act and the National Bank Act, which the McFadden Act had amended

Court stated, "As Data Processing demonstrates, we are not limited to considering t

statute under which respondents sued, but may consider any provision that helps us

---

[0]See also Investment Co. Inst. v. Camp, 401 U.S. 617, 621 (1971) (holding that asso
of investment companies had standing to challenge regulation authorizing banks to o
collective investment funds); Arnold Tours, Inc. v. Camp, 400 U.S. 45, 46 (1970) (h
that travel agents had standing to challenge decision to allow banks to provide tra
services to their customers).

14

understand Congress' overall purposes in the National Bank Act."  Id. at 401. Furth

as in prior cases, the Court held that "competitors who allege an injury that impli

the policies of the National Bank Act are very reasonable candidates to seek review

Comptroller's rulings."  Id. at 403.

Although Clarke noted the zone of interests "test is not meant to be espe

demanding; in particular, there need be no indication of congressional purpose to k

the would-be plaintiff," id. at 399-400 (footnote omitted), recent Supreme Court

jurisprudence suggests a somewhat stricter test.  See, e.g., Chem Serv., Inc. v.

Environmental Monitoring Sys. Lab., 12 F.3d 1256, 1262 (3d Cir. 1993) ("Most recent

Court has taken a stricter view of what statute or statutes should be considered as

'relevant' for the purpose of applying the zone of interest test.").  The prominent

example of this stricter approach is Air Courier Conference of America v. American

Workers Union, 498 U.S. 517 (1991).

In Air Courier Conference, unions representing postal workers challenged

Postal Service regulation that suspended the postal monopoly to permit "internation

remailing," the practice of "bypassing the Postal Service and using private courier

systems to deposit with foreign postal systems letters destined for foreign address

Id. at 520.  The Court of Appeals for the District of Columbia Circuit had found st

because the PRA, the statute also at issue in this case, provided protections for w

while recodifying the Private Express Statutes ("PES"), which governed the postal m

over mail delivery. Thus, the D.C. Circuit concluded, the employees' interests were

the "zone of interests" of the PRA.  Id. at 521-22.

The Supreme Court reversed, holding that the Court of Appeals had erred i

looking at the entire PRA in applying the "zone of interests" test.  The Court stat

> The only relationship between the PES, upon which the Unions rely for
> their claim on the merits, and the labor-management provisions of the
> PRA, upon which the Unions rely for their standing, is that both were
> included in the general codification of postal statutes embraced in
> the PRA.  The statutory provisions enacted and reenacted in the PRA

15

are spread over some 65 pages in the United States Code and take up an entire title of that volume.  We said in Lujan that "the relevant statute [under the APA] of course, is the statute whose violation is the gravamen of the complaint."  To adopt the unions' contention would require us to hold that the "relevant statute" in this case is the PRA, with all of its various provisions united only by the fact that they deal with the Postal Service. But to accept this level of generality in defining the "relevant statute" could deprive the zone-of-interests test of virtually all meaning.

Unlike the two sections of the National Bank Act discussed in Clarke, supra, none of the provisions of the PES have any integral relationship with the labor-management provisions of the PRA.

Id. at 529-30 (quoting Lujan v. National Wildlife Fed'n, 497 U.S. 871, 886 (1990) (citation omitted)).  Accordingly, the Supreme Court held the unions lacked standin[g to] bring their claim.[0]

The Postal Service contends that Air Courier Conference dictates that UPS [be] denied standing in this case. [0]  It alleges the purposes behind the PRA sections involved here, 39 U.S.C. §§101(d), 403(b)-(c), and 407(a),[0] were not to protect competitors of the Postal Service.  Instead, the Postal Service claims that §§ 101[(d),] 403(b)-(c), which generally require fairness in establishing postal rates, were int[ended] to protect mailers. Furthermore, the Postal Service argues that § 407(a) was meant [to] protect the president's foreign policy authority, not the interests of private Post[al]

_____

[0]Under 39 U.S.C. § 410(a), the Postal Service is not covered by chapters 5 and 7 of [Title] 5, the provisions of the Administrative Procedure Act that involve "Administrative Procedure" and "Judicial Review."  In Air Courier Conference, the Supreme Court dec[lined] to determine whether § 410(a) exempts the Postal Service from judicial review under [the] APA, holding that the Postal Service had waived the issue.  498 U.S. at 522-23 & 52[3 n.3.] But see id. at 531-32 (Stevens, J., dissenting). Similarly, although the Postal Ser[vice] briefly mentions the issue in a footnote, see Appellant's Brf. at 11 n.3, it states [it is] "content" to have this case judged under the "zone of interests" test.  See Appella[nt's] Reply Brf. at 3 n.1.  Thus, we consider the matter waived.

[0]In Air Courier Conference, the trade association ACCA intervened on behalf of the [Postal] Service and argued the unions lacked standing, leaving the Postal Service only a "nominal[]" litigant.  498 U.S. at 520, 522.  Ironically, the Postal Service in thi[s case] is attempting to use that decision against ACCA so as to deny it the right to inter[vene] and UPS the right to litigate.

[0]For the text of these sections, see supra notes 1-3.

16

Service competitors.  Thus, the Postal Service asserts, UPS should be denied standi

here.

We believe the Postal Service misconstrues the lessons of Air Courier Con

and its predecessors.  These cases do not require that plaintiffs be among the inte

beneficiaries of the statute under which they are suing.  See, e.g., Clarke, 479 U.

399-400 (requiring "no indication of congressional purpose to benefit the would-be

plaintiff"); Schering Corp. v. FDA, 51 F.3d 390, 395 (3d Cir. 1995) ("The [zone of

interests] test, however, is not so stringent that it requires the would-be plainti

be specifically targeted by Congress as a beneficiary of the statute.").  Even Air

Conference merely required an "integral relationship" between the statutory provisi

plaintiffs claim have been violated and the provisions under which plaintiffs claim

standing.  Air Courier Conference, 498 U.S. at 530 (noting that "none of the provis

the PES have any integral relationship with the labor-management provisions of the

see also Chem Serv., Inc., 12 F.3d at 1264-65 (upholding standing where statutes fo

have an "integral relationship" with each other (quoting Air Courier Conference, 49

at 530)).

In this case, we believe an "integral relationship" exists among the rele

statutory provisions.  Sections 101(d), 403(b)-(c), and 407(a) provide procedures f

manner in which postal rates may be adopted and the types of rates that will and wi

be permitted.  As we noted supra in part II, the history of the Postal Service

---

[0]In view of the "integral relationship" language, we do not interpret Air Courier
Conference as establishing a strict zone of interests test contrary to previous Sup
Court precedent, such as Clarke, where the Court stated that the zone of interests
is not meant to be especially demanding."  479 U.S. at 399. Air Courier Conference,
note, merely held that a recodification of an entire title of the United States Cod
covering hundreds of statutory provisions developed over the course of two centurie
not constitute one "statute," within the meaning of the zone of interests test.  Se
Courier Conference, 498 U.S. at 529-30 ("The statutory provisions enacted and reena
the PRA are spread over some 65 pages in the United States Code and take up an enti
title of that volume. . . .  [T]o accept this level of generality in defining the
'relevant statute' could deprive the zone-of-interests test of virtually all meanin

17

demonstrates that Congress understood that statutes setting postal rates were inext

linked with those governing the postal monopoly.  See Air Courier Conference, 498 U

526-27 (citing Act of Mar. 3, 1845, 5 Stat. 732).  Both types of statutes were inte

affect competitors.  See id.

In fact, in Air Courier Conference, the Supreme Court recognized that

competitors fall within the zone of interests of the postal monopoly statutes.  See

528 n.5 ("The PES are competition statutes that regulate the conduct of competitors

Postal Service.  The postal employees for whose benefit the Unions have brought sui

are not competitors of either the Postal Service or remailers.").  Although the Sup

Court noted that "[e]mployees have generally been denied standing to enforce compet

laws because they lack competitive and direct injury," id., it reiterated that

"competitors of regulated entities have standing to challenge regulations."  Id. at

In this case, it is undisputed that UPS is a competitor of the Postal Service.  Bec

the regulation at issue involves Postal Service rate-making -- a fundamental means

affecting competition, as we noted supra in part II -- UPS has standing to challeng

Such standing is all the more clear in cases, like this one, where the agency that

promulgating the regulation is also the "competitor" whose interests are being adva

These statutes, governing the postal monopoly and postal rate-making, are

different footing than the labor-management provisions under which plaintiffs claim

standing in Air Courier Conference.  Those labor provisions were a new feature of t

Act, unrelated to the postal monopoly provisions that had existed for more than a c

See Air Courier Conference, 498 U.S. at 524-28.  But as we have noted, the relation

between the postal monopoly and rate-making rules -- and their effect on competitor

has existed for most of the two-hundred year history of the postal statutes.  See s

part II.

Furthermore, while the Supreme Court has recognized competitors have an i

in enforcing the postal monopoly statutes, Congress has provided that competitors a

18

within the "zone of interests" of the postal rate-making statutes.  The PRA express

requires that the Postal Rate Commission, in recommending rates, consider the effec

increases on, <u>inter alia</u>, "enterprises in the private sector of the economy engaged

delivery of mail matter other than letters."  39 U.S.C. §3622(b)(4).  The same sect

also requires the Commission to consider the "policies of this title," thereby

incorporating the statements of "[p]ostal policy" of § 101, which is one of the pro

under which UPS has filed suit.  Thus, we believe competitors such as UPS fall with

"zone of interests" of these rate-making statutes.

In fact, we believe the Postal Service has largely conceded the issue.  I

brief, the Postal Service admitted that competitors would have standing to sue unde

101 and 403 if they alleged that the rates set were a "predatory attempt to destroy

competition."  <u>See</u> Appellant's Brf. at 16.  In conceding standing in this context,

Postal Service necessarily admits that protecting competitors from economic injury

by illegal regulations falls within the zone of interests of these statutory provis

We fail to see why competitors would be within the zone of interests if §§ 101 and

were violated by the Postal Service's predatory rate pricing but not if the same

provisions were violated by the Postal Service's establishment of unfair or inequit

rates.

In evaluating the PRA's rate-making provisions, it appears that Congress

concerned with balancing certain societal interests: those of government, various

categories of mailers, and private competitors.  Recently we faced a similar situat

<u>Schering Corp. v. FDA</u>, 51 F.3d 390 (3d Cir. 1995), in which a drug manufacturer cha

the FDA's approval of a regulation that permitted its competitors, manufacturers of

generic drugs, to use an abbreviated application procedure.  In affirming the drug

manufacturer's standing, we recognized the relevant Act "reflect[ed] a statutory

compromise of the competing concerns" of the public and of various drug manufacture

<u>Id.</u> at 396 (citation omitted).  Similarly, we view the sections of the PRA governin

19

postal rates as striking a balance between competing concerns. Although we underst[...]

fundamental purpose of the PRA was to make the Postal Service more competitive, we [...]

that Congress also expressed some concern for private competitors of the Postal Se[...]

See, e.g., 39 U.S.C. §3622(b)(4). Accordingly, we hold that UPS falls within the '[...]

interests" of these statutory provisions generally governing postal rates.[0]

## IV.

Turning to the merits, we address the district court's holding that the [...] Service's promulgation of the regulation establishing the ICM service violated seve[...] provisions of the PRA. See

UPS Worldwide Forwarding, Inc. v. United States Postal Serv., 853 F. Supp. 800, 804 [...] Del. 1994). To understand these provisions, it is necessary to consider the framew[...] the rate-making sections of the PRA and how the ICM service fits within this statut[...] scheme.

## A.

As we have noted, a fundamental change wrought by the PRA was to transfer [...] making authority from Congress to the Postal Service and related agencies. See supr[...] II. For domestic rates, the PRA established a complex process whereby the Postal S[...] proposes rates, the Postal Rate Commission considers the proposals and offers its [...] recommendations, and the Governors of the Postal Service act on the recommendations[...] Air Courier Conference of America v. United States Postal Serv., 959 F.2d 1213, 121[...] Cir. 1992) (citing various provisions of the PRA). In making its recommendations, [...] Commission is instructed to consider numerous factors listed in the PRA, 39 U.S.C. [...] 3622(b), and it must conduct a hearing to allow the Postal Service and public to te[...] Id. § 3624. For certain types of mail, such as the different classes of mail for [...] the Postal Service must establish a rate that is "uniform throughout the United Sta[...]

---

[0] For the same reasons we hold UPS to have standing, we find that ACCA has standing [...] intervene in this case.

20

its territories, and possessions." Id. § 3623(d); see also id. § 3683 (prescribing

"[u]niform rates for books; films; other materials").

In contrast to the domestic rate-making procedure, the PRA's international

making rules are a model of simplicity. The PRA provides:

> The Postal Service, with the consent of the President, may negotiate and conclude postal treaties or conventions, and may establish the rates of postage or other charges on mail matter conveyed between the United States and other countries.

39 U.S.C. § 407(a). No proposals need be made and considered by other bodies, no p

hearings held, and no specific criteria considered. Instead, the Postal Service ne

"establish" international rates, with the President's consent. We believe the diff

between the domestic and international rate-making procedures demonstrate that Cong

intended the Postal Service to have significant authority and flexibility in establ

the rates for mail sent abroad.

B.

Pursuant to the PRA statutory scheme, the Postal Service promulgated the

service for international mailers. See 58 Fed. Reg. 29778 (1993). In publishing it

interim regulation, the Postal Service offered two primary reasons for the ICM serv

First, it explained that other countries have adopted varying charges on mail sent

the United States, with some based on weight and others on volume. A uniform price

overseas mail, particularly for large-volume customers, meant that "some customers

published rates disproportionate to the costs that the Postal Service would incur i

providing those customers with the services in question . . . ." 57 Fed. Reg. 3065

30652 (1992). The Postal Service explained:

> Until relatively recently, the most significant components of the
> costs incurred by the Postal Service in connection with its
> international operations, namely transportation expenses and the
> charges imposed by foreign postal administrations to deliver U.S.-
> origin mail (terminal dues), were based exclusively on weight.
> Although transportation expenses are still a function of weight, the
> postal administrations of countries to which much U.S. mail is sent
> have implemented terminal dues arrangements that recognize that mail
> processing costs vary by volume as well as by weight. Moreover, the
> Postal Service currently is charged terminal dues by foreign postal
> administrations using four different methods of calculation.
> Consequently, the Postal Service incurs substantially different costs
> for delivering mail to different countries. Due to uniform pricing,
> however, the Postal Service's rates do not reflect country-specific
> costs to the extent possible. Similarly, uniform rates do not
> generally take into account differences in how mail is prepared or
> where it is tendered, both of which can significantly affect costs.

Id. (footnote omitted).

Second, because of the regulation permitting private couriers to deliver

international mail, the Postal Service faced increasing competition from companies

attempting to lure mailers by "implementing flexible rate structures and customer-s

service offerings." Id. The Postal Service noted:

> This flexibility enables the Postal Service's competitors to
> tailor service features to individual customers and to price those
> features on a partially or completely disaggregated basis. In
> contrast, traditional Postal Service pricing policies and practices,
> whereby the Postal Service generally treats all current and potential

22

> customers identically and uses averaged costs when setting rates, are not designed to deal with a competitive environment.  The expanded alternatives available to customers and the improved attractiveness of those alternatives have made it increasingly difficult for the Postal Service to sell its services to a varied group of customers using a single published schedule of rates.  To the extent that uniform pricing prevents the Postal Service from attracting new customers and keeping existing customers, all of the Postal Service's other users suffer by having to pay more for their postal services.

Id.

Despite its reasons for implementing the program, the Postal Service dete that it would not be feasible to offer ICM service to everyone "regardless of size mailing patterns." Id. at 30653.  The Postal Service estimated substantial costs to negotiate and implement the ICM agreements; expenses were high enough so that "for the largest volume customers, those costs in many instances could be greater" than Postal Service earned from the ICM program.  Id.  Furthermore, the Postal Service e to benefit from economies of scale generated by large-volume customers that would n occur with smaller mailers. As it noted, "[I]ncreased volumes amplify the beneficia effects of flexible pricing."  Id.  Because ICM agreements vary depending upon the of services required by individual customers, ICM rates may be higher, lower, or th as ordinary public rates.

C.

Despite the flexibility accorded the Postal Service in the international see supra part IV.A, the PRA contains several general statements of policy, duties, powers -- such as prohibitions on discrimination and requirements of fairness --tha as additional limitations on both domestic and international rates.  See 57 Fed. Re 30651, 30652 (1992) (listing, inter alia, §§ 101(d) and 403(c) as restricting rates is these general statutory statements of "policy" and "duties" on which UPS relies attacking the ICM program.  We will consider each of these sections in turn.

1.

23

Section 101 opens the PRA, outlining general statements of "Postal policy

Subsection (d) provides: "Postal rates shall be established to apportion the costs

postal operations to all users of the mail on a fair and equitable basis."  A simil

general requirement is contained in § 403(c), which lists the "[g]eneral duties" of

Postal Service:

> In providing services and in establishing classifications, rates, and fees under this title, the Postal Service shall not, except as specifically authorized in this title, make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user.

The district court found the ICM service violated these provisions becaus

qualify for the program, customers must be capable of mailing one million pounds of

international mail or paying two million dollars in international postage per year,

they need not actually mail or pay any specified amounts.  See 58 Fed. Reg. 29778.

district court stated:

> Under the ICM system, small-volume mailers who are not able to meet the threshold capacity requirements of the ICM agreements are not able to gain the benefit of an individually negotiated, lower rate.  The costs are not apportioned fairly, because under the ICM, there is no requirement that the large-volume mailer actually deliver more than the small-volume mailer.

UPS Worldwide Forwarding, 853 F. Supp. at 805.  The court found this set of circums

discriminated unreasonably against small-volume mailers.  Id.  In so holding, the c

stated that "[s]eemingly, there is no reasonable explanation as to why the Postal S

uses capability as a criteria rather than actual performance."  Id.  We disagree.

We believe the Postal Service has offered a reasonable explanation for it

business decision to require that mailers be "capable" of tendering a certain thres

amount of mail, rather than mandating that potential customers agree up front to ac

tender that minimum.  As counsel explained at oral argument:

> To require a commitment would just sort of drive [potential customers] off.  I mean, if you say we are not giving you this business until you commit to it, then you never get the business.

24

> It is better to make them the offer, get them to try the
> business, and then in practice my client informs me, once you get the
> business of a big company, you tend to get all its business.

Tr. at 44-45. We believe this provides a logical and reasonable explanation for th

Postal Service's business decision. UPS does not contend the Postal Service's expl

fails to pass muster in an economic sense; it merely argues the Postal Service does

have the authority to make such business judgments. But Congress repeatedly indica

that a primary purpose underlying the PRA was to require the Postal Service to disc

system of political patronage and bureaucratic decision-making in favor of modern b

practices. See infra part IV.D. We see nothing in the PRA that prevents the Posta

Service from innovative attempts to increase its business and profits, as long as i

within the bounds of the relevant statutes.

As we have noted, § 101(d) provides that "[p]ostal rates shall be establi

apportion the costs of all postal operations to all users of the mail on a fair and

equitable basis." The determination whether a particular rate is "fair" or "equita

not capable of precise definition, but we do not view the ICM service as unfair or

inequitable. The program may benefit large-volume mailers over their smaller count

because of economies of scale. That the Postal Service chose to offer the program

those "capable" of tendering a certain minimum level of mail or dollars, instead of

that actually so deliver, reflects a reasonable business decision about the most ef

means to solicit new customers.

Similarly, we do not view the ICM service as violative of § 403(c)'s ban

"undue or unreasonable discrimination" or "undue or unreasonable preferences." We

ignore that the "undue or unreasonable" language, twice repeated in § 403(c), means

reasonable discrimination and preferences among users of the mail are permitted. A

a limited class -- the relatively small percentage of large-volume mailers eligible

participate in the ICM program -- to negotiate individual service plans at individu

rates does not appear on its face to be "undue or unreasonable." As we have noted,

permits the Postal Service to compete more effectively for the business of large-vo

mailers, <u>see</u> <u>supra</u> part IV.B, fulfilling congressional intent. <u>See</u> <u>infra</u> part IV.I

As with the terms "fair" and "equitable" in § 101(d), we find it difficul

define the contours of what constitutes "undue or unreasonable" discrimination or

preferences. We note that other courts, when confronting this section, have accord

postal authorities broad latitude. In <u>Mail Order Ass'n of America v. United States</u>

<u>Service</u>, 2 F.3d 408, 434 (D.C. Cir. 1993), magazine publishers challenged the Posta

Commission's decision not to adopt a "zoned" second-class mail rate, i.e., a rate t

would increase with distance. Because the Commission's decision had not violated a

specific rate provision of the PRA, the Court of Appeals for the District of Columb

reasoned that:

> The question, then, is whether the Commission was arbitrary in its
> ultimate trade-off between the cost considerations that pointed toward
> zoning, and the competing values that it ultimately favored. Any such
> arbitrariness would presumably violate 39 U.S.C. § 403(c)'s
> prohibition of "undue or unreasonable preferences."

<u>Id.</u> at 435-36. The court noted that "[t]he refusal to zone indeed appears unsuppor

any cost principle." <u>Id.</u> at 436. Nevertheless, the court ultimately held that, bec

the Commission had valid reasons for its decision, it had not violated § 403(c).

437.[0] Similarly, as we noted <u>supra</u> in part IV.B., the Postal Service had equally v

reasons for its decision to create the ICM service.

---

[0]It is instructive that the Universal Postal Union, the United Nations agency gover
international mail, permits postal authorities to "give preferential rates to major
of the Post." <u>See</u> 58 Fed. Reg. 29778 (citing UPU Convention, art. 20, ¶ 15).
[0]Other courts have reached similar conclusions. In <u>Aimes Publications, Inc. v. Uni</u>
<u>States Postal Service</u>, Civ. A. No. 86-1434, 1988 WL 19618, at *6 (D.D.C. Feb. 23, 1
the court noted the Postal Service's enforcement of its second-class statutory rule
apparently was "at best, uneven," but it found no violation of § 403(c). The court
that "[t]ypically, the court[s] have given the Postal Service broad discretion in
administering the classification scheme, which necessitates differentiating among u
<u>Id.</u> at *7 n.13. And in <u>Egger v. United States Postal Service</u>, 436 F. Supp. 138 (W.
1977), a student challenged a Postal Service policy that provided a different level
service to single students living in university housing than that provided for marr
students. In upholding the different service levels, the court noted:

On its face, then, we believe the ICM service does not violate § 403(c).

regulation promulgating the ICM program requires the Postal Service to "make every

service agreement available to similarly situated customers under substantially sim

circumstances and conditions." See 58 Fed. Reg. 29782. To facilitate that process,

regulation mandates that the Postal Service publish detailed information about each

agreement, including the term, rate, type of mail involved, destination country or

countries, minimum volume commitments, and descriptions of services to be provided

Postal Service and mailer. Id. We believe the publication of this information wil

permit competitors and mailers alike to verify that the Postal Service is complying

its mandate not to grant "undue or unreasonable" discrimination or preferences.

2.

As we have noted, § 403 provides the "[g]eneral duties" of the Postal Ser

Subsection (b)(2) provides: "It shall be the responsibility of the Postal Service t

provide types of mail service to meet the needs of different categories of mail and

---

> While it is obvious that [§ 403(c)] prohibits undue or unreasonable
> discrimination among users in the provision of delivery services, it
> is also equally obvious that the Postal Service may provide different
> levels of delivery service to different groups of mail users so long
> as the distinctions are reasonable. The goal sought by the Postal
> Service in the instant case by their discrimination is the efficient
> and economical delivery of the mail. The goal is legitimate and the
> only question before the court is whether the distinctions between the
> three groups are rationally related to the achievement of the goal.

Id. at 142; see also Time, Inc. v. United States Postal Serv., 710 F.2d 34, 41 n.8
Cir. 1983) (holding that the disparities between the contribution to the Postal Ser
fixed costs from each class of mail service "are not so great as to amount to 'undu
unreasonable discrimination among users of the mails'"); Direct Mail/Mktg. Ass'n, v
United States Postal Serv., 501 F.2d 717, 722 (D.C. Cir. 1974) (upholding temporary
changes that allegedly discriminated against third-class mailers in violation of §
because the Postal Service action was "manifestly reasonable"); Ludewig v. Wolff, 4
Supp. 1048, 1049 (S.D. Tex. 1980) (finding no violation of §403(c) "because the
distinctions made by the regulations are reasonably related to the effectuation of
pertinent objectives of the Postal Reorganization Act").

27

users."  The district court held the ICM program violated §403(b)(2) because it ser[ved]
"individual" users, not "categories" of users.
UPS Worldwide Forwarding, 853 F. Supp. at 804-05.  We disagree.

The ICM program is open to those customers capable of tendering one milli[on]
pounds of international mail or paying two million dollars in international postage[.]
consider that group of customers to be a "category" of mail users, and believe the
Service is providing "mail service to meet the needs" of that category of users by
offering them the ability to negotiate individualized service plans to meet indivi[dual]
needs.  Section 403(b) does not specify that, to meet the needs of a category of us[ers,]
the Postal Service must give them all the same rate.  In fact, the Postal Service m[ay]
better "meet the needs" of large-volume mailers by offering them individualized se[rvice]
plans at individual rates.

But UPS contends that § 403(b)(2) generally prohibits individually-negoti[ated]
rates.  Once again, we disagree.  As we have noted, § 403(c) bars "undue or unreaso[nable]"
discrimination and preferences.  That necessarily means that reasonable discrimina[tion and]
preferences are permitted.  See supra part IV.C.1.  Furthermore, the various domest[ic]
provisions that require "uniform" rates demonstrate that Congress knew how to manda[te]
uniformity and equality when it desired.  See, e.g., 39 U.S.C. § 3623(d) (requiring
rates for each class of letter mail be "uniform throughout the United States, its
territories, and possessions"); id. § 3683 (prescribing "[u]niform rates for books;
other materials").

Finally, we fail to understand how the statement of "[g]eneral duties" of [the]
Postal Service could forbid the ICM program.  Instead of a restriction on the power[s of]
the Postal Service, it merely enumerates, as its title indicates, the Service's "[general]
duties."  Viewing the statutory scheme overall, § 403 was intended to list "[g]ener[al]
duties," while other sections of the PRA specified duties, powers, and limitations.
is nothing in this section that bars the Postal Service from doing more than the mi[nimum]

28

required here. Thus, as long as the Postal Service provides service to "meet the ne[...]
different categories of mail and mail users," it also may provide individualized se[...]
See, e.g., 39 C.F.R. §3001.68, App. A, ¶ 500.021 (describing the Postal Service's
established "Custom Designed Service," in which customers negotiate with the Postal
Service for specialized pick-up and delivery arrangements).

### 3.

Section 407(a), governing "[i]nternational postal arrangements," provides[...]
"[t]he Postal Service, with the consent of the President, may negotiate and conclu[...]
postal treaties or conventions, and may establish the rates of postage or other cha[...]
mail matter conveyed between the United States and other countries."  The district
held § 407(a) requires the President to consent to new international postal rates.
Worldwide Forwarding, 853 F. Supp. at 806.  On appeal, neither party disputes this
holding.  But UPS makes two arguments under § 407(a).

### a.

UPS contends the ICM service is prohibited by the phrase, "establish the [...]
of postage or other charges."  UPS claims that "establish" means to "set up . . .
permanently" and "rates" are "standardized prices made available to the public at l[...]
Appellee's Brf. at 25 (citations omitted).  Thus, UPS asserts, § 407(a) does not pe[...]
the individual rates found in the ICM service. We disagree.  If "establish" means [...]
creating permanent rates, the Postal Service could never change its rates. We do no[...]
believe Congress intended that result.  Furthermore, the word "rates" may well indi[...]
as UPS claims, "standardized prices available to the public at large," but § 407(a)[...]
the Postal Service to "establish the rates of postage or other charges" (emphasis a[...]
We believe the negotiated rates of the ICM service satisfy the latter part of the p[...]
if not the former.

### b.

29

UPS also alleges the President never manifested the requisite consent un[der §]
407(a). The Postal Service responds that the President consented by allowing the [rates to]
take effect without objection. Because it is clear that the President never formal[ly]
consented to the adoption of the ICM service, we must consider the historical pract[ice]
under the statute.

As we noted, Congress enacted legislation in 1851 permitting the Postmas[ter]
General, "by and with the consent of the President," to change the international po[stal]
rates set by Congress. See Act of Mar. 3, 1851, ch. 20, § 2, 9 Stat. 587, 588; see [also]
Act of June 8, 1872, ch. 335, § 167, 17 Stat. 283, 304. The statute remained esse[ntially]
the same until 1970, when the PRA permitted the "Postal Service, with the consent o[f the]
President," to "establish" those rates.

Neither party has submitted any evidence that, from the adoption of the 1[851]
Act, the President ever has affirmatively manifested, by word or deed, his consent [to]
changes in international rates. The Postal Service notes that international rates [have]
changed at least sixty times since 1945, all without express presidential approval. [See]
Aff. of John F. Alepa, Manager of Pricing, U.S. Postal Service, App. at 55-62; cf.
Courier Conference of America v. United States Postal Serv., 959 F.2d 1213, 1222-23 [(D.C.]
Cir. 1992) ("Before the [PRA] was passed, international rates had been set by the
Postmaster General's administrative fiat . . . ."). Thus, the undisputed historica[l]
record indicates the President and postal authorities have long interpreted § 407(a[) as]
not requiring the affirmative consent of the President.

In its brief, UPS argues the Postal Service has offered no evidence that [the]
President agrees with its interpretation of the § 407(a) consent provision. See
Appellee's Brf. at 41-42. But after submission of UPS's brief, the President publis[hed a]
memorandum in the Federal Register, delegating until completion of this appeal his
authority under § 407(a) to establish postage rates. 59 Fed. Reg. 65471 (1994). [The]
memorandum provides:

30

[T]he Government argues that the explicit consent of the President is not required.  In the view of the Government, to the extent that 39 U.S.C. 407(a) does require the President to consent, it does not require that consent be given in any particular manner.  The Government's position is that the failure of the President to object to the establishment of international postage rates and other charges is consent to the establishment of such rates and other charges.  This has been the practice of the Government for the past 120 years.

Id.

Nevertheless, after viewing the unique history of the application of § 40[...] we believe the President has demonstrated how he has manifested his consent to acti[...] the Postal Service.  We decline UPS's invitation to prescribe certain procedural st[...] President must take in this regard. Although such guidance might be necessary with [...] different statutes, agencies, or branches of government, we believe it is inappropr[...] this context.  Although the President and the Postal Service now agree he may conse[...] international postal rate changes merely by not objecting, we rely only on the hist[...] practice under § 407(a) in upholding the ICM service.[0]

D.

In challenging the Postal Service, its competitors characterize it as a "[...] service" and "essentially a public utility."  See Appellee's Brf. at 11, 22.  In th[...] domestic area, we believe those descriptions are apt.  In some ways, the skepticism[...] surrounding the ICM service exists because the program seems antithetical to tradit[...] notions of the Postal Service. We expect to pay the same price for a postage stamp [...] everyone else, not to have to bargain for the best rate.  In this sense, the Postal[...]

---

[0]UPS contends the Postal Service never argued before the district court that the Pr[...] consented to the ICM service; thus, UPS claims, the Postal Service has waived this [...] argument. Although the Postal Service disputes that it waived the issue, we need n[...] decide the question.  We may "review a waived issue under exceptional circumstances[...] as when the "public interest" so requires.  Fleck v. KDI Sylvan Pools, Inc., 981 F.[...] 117 (3d Cir. 1992), cert. denied, 113 S. Ct. 1645 (1993). Because this case involve[...] President's authority to determine the manner of his consent to agency action and t[...] validity of more than a century's worth of international postal rates, we hold that [...] "exceptional circumstances" exist here.

Service is properly compared to a public utility that charges the same rate to all

customers.

But the Postal Service retains its centuries-old monopoly only in the dom

market.  In the international arena, Congress has freed the Postal Service from the

constraints that protect domestic mail rates.  See 39 U.S.C. § 407(a); supra part I

Without a monopoly to protect its international business, see 39 C.F.R. §§ 320.6, 3

the Postal Service now faces competition from UPS and other entities.  See supra pa

IV.B.  Thus, the reasons that may compel a uniform rate for postage in the United S

no longer apply to large-volume international mailers.

In enacting the PRA, Congress repeatedly explained the fundamental reason

the dramatic changes mandated by the Act; it wanted the Postal Service to operate l

like a bureaucratic agency and more like a business.  The relevant committee report

repeat this principle again and again.  See, e.g., H.R. No. 1104, 91st Cong., 2d Se

(1970), reprinted in 1970 U.S.C.C.A.N. 3649, 3660 ("The Postal Service is a public

but there is no reason why it cannot be conducted in a businesslike way and every r

why it should be.").[0]

_____

[0]See also H.R. Rep. No. 1104, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.C.
3649, 3650 (The PRA is intended to "[e]liminate serious handicaps that are now impo
the postal service by certain legislative, budgetary, financial, and personnel poli
that are outmoded, unnecessary, and inconsistent with the modern management and bus
practices . . . ."); id. at 3653 ("Top management must be given authority, consiste
its responsibilities, to provide an efficient and economical postal system.  Postal
management has been severely and unjustly hampered in its efforts to administer the
Department in a businesslike way."); id. at 3654 (The bill provides "authority to c
the affairs of the Postal Establishment on a business like basis . . . ."); id. at
("The mandate that the Postal Service must be self-supporting is essential if posta
affairs are to be conducted with reasonable economy and efficiency."); S. Rep. No.
91st Cong., 2d Sess. 3 (1970) ("[P]ostal management must now be given the unfettere
authority and freedom it has been denied for years to maintain and operate an effic
service."); id. ("[T]he laws controlling the governance of the [Post Office] Depart
have become excessively restrictive and [] it is not too soon for a complete break
the past.").

While Congress hoped to achieve efficiency in postal operations by enact[ing] PRA, it also sought innovation.  As the House Report noted, the Act "envisions a na[tional] postal service that is forever searching for new markets and new ways by which the communication needs of the American people can be served."  H.R. No. 1104, 91st Con[g., 2d] Sess., reprinted in 1970 U.S.C.C.A.N. at 3668-69.[0]  We believe the ICM service cons[titutes] an appropriate part of that effort.

---

[0]See also H.R. Rep. No. 1104, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.C.[C.A.N.] 3649, 3657 ("The Postal Service is empowered to engage in research and development programs directed toward the expansion of present postal service and the developmen[t of] new services responsive to the evolving needs of the United States"); id. at 3668 [(PRA] "is designed to prevent public service from involving public wastefulness in postal matters.  This must be done not only by requiring postal management to operate effi[ciently] and economically, but also by requiring it to seek out the needs and desires of its present and potential customers -- the American public."); S. Rep. No. 912, 91st Co[ng., 2d] Sess. 3 (1970) (noting prior postal laws "inhibit[ed] innovation and imagination i[n the] management of the Post Office").

V.

As a final matter, we consider the proper level of deference to be accord[ed] Postal Service's interpretation of the PRA.  The Postal Service contends its regula[tions] are to be given "controlling weight" as long as they represent a "reasonable interpretation" of the statute, pursuant to Chevron U.S.A. Inc. v. Natural Resource[s] Defense Council, Inc., 467 U.S. 837, 844 (1984).  We confronted this general issue [in Air] Courier Conference v. United States Postal Service, 959 F.2d 1213, 1223-25 (3d Cir. [1992),] and we found Chevron to be controlling.

In Air Courier Conference, we considered whether the PRA required the Pos[tal] Rate Commission to consider any Postal Service change to international rates.  959 [F.2d at] 1215-16.  In deciding the PRA did not require it, we noted the Postal Service and t[he] Commission agreed that the latter agency played no part in international rate-makin[g, and] found the "argument that the Postal Service's bureaucratic bias lessens the need fo[r] deference is counter-balanced by the express acquiescence of the Commission in the [Postal] Service's view."  Id. at 1225.  As UPS notes, such concurring agency views do not e[xist] here.

In reaching our decision in favor of the Postal Service, we have been co[nvinced] that Congress intended the PRA to permit the agency to operate more like a private [sector] business.  See supra part IV.D.  As the Supreme Court has noted, "[b]y launching 't[he] Postal Service into the commercial world,' and including a sue-and-be-sued clause i[n its] charter, Congress has cast off the Service's 'cloak of sovereignty' and given it th[e] 'status of a private commercial enterprise.'"  Loeffler v. Frank, 486 U.S. 549, 556 [(1988)] (citations omitted).  Because in this case we construe a Postal Service regulation [that is] explicitly designed to "attract customers that currently use its competitors," see [64 Fed.] Reg. 29778, 29780, it would appear that a reduced level of deference is appropriate[.] But we are convinced the ICM service does not contravene the PRA, and so we do not [require] any deference that might be due.

34

VI.

For the reasons expressed, we will reverse the judgment of the district c